UNITED STATES of America,
Plaintiff–Appellee,

v.

Kline A. GOWEN, Defendant–Appellant.

No. 93–8077.

United States Court of Appeals,
Tenth Circuit.

Aug. 18, 1994.

Kline A. Gowen, pro se.

David D. Freudenthal, U.S. Atty., and Matthew H. Mead, Asst. U.S. Atty., Cheyenne, WY, for plaintiff-appellee.

Before SEYMOUR, Chief Judge, McKAY, and BALDOCK, Circuit Judges.

SEYMOUR, Chief Judge.

Kline A. Gowen was convicted after a jury trial of one count of aggravated sexual assault, in violation of 18 U.S.C. § 2241(a)(1), and two counts of sexual assault, in violation of 18 U.S.C. § 2242(1). He was sentenced to a concurrent sentence of 120 months on each count and five years of supervised release. Mr. Gowen raises numerous allegations of error on appeal, asserting inter alia that his confrontational rights were violated by the government's failure to disclose the results of tests and examinations, that his due process rights were violated by the government's closing argument, and that the government knowingly used perjured testimony.[1] We affirm.

I.

The events underlying Mr. Gowen's conviction took place at the Mammoth Hotel in

---

1. We note that Mr. Gowen appeared pro se at trial, accompanied by a federal public defender as standby counsel, and continues to appear pro se on appeal. He has raised no issue with respect to his pro se status other than to contend that he did not receive adequate investigative assistance from the federal public defender not-

Yellowstone National Park, where Mr. Gowen was employed at the front desk. The victim of the assaults was a single woman travelling as a tourist who was checked into the hotel by Mr. Gowen. Mr. Gowen gave the victim general information about the area and offered to act as a guide the following day. He told the victim he would come up to her room that night when he got off work around midnight to discuss the next day's plans. The victim told him to knock softly and if she were still awake she would come to the door.

The evidence, when viewed most favorably to the government, *see United States v. Mann*, 884 F.2d 532, 535 (10th Cir.1989), reveals the following sequence of events that began when Mr. Gowen went up to the victim's room after his shift ended. Mr. Gowen knocked loudly on the door and woke up the victim, who had been asleep for about two hours. They spoke briefly, she rejected his plans for the following day, reentered the room, turned out the light and returned to bed. At about 12:45 a.m., Mr. Gowen used a room key to enter the victim's room without her permission, turned on the lights, and began to drink from a bottle of tequila he had brought with him. While he drank, he told her his life story, "[mentioning] incest, ... bank robbery, ... being a stripper in Miami, ... assaulting someone else in San Antonio, and that he had represented himself and successfully gotten off on a case in front of a judge and a jury." Rec., vol. VIII, at 39. Mr. Gowen refused the victim's repeated requests that he leave and became more angry and agitated each time she asked him. Ultimately, Mr. Gowen showed the victim a note he had written to a woman employed at the hotel with whom he had unsuccessfully attempted to have a romantic relationship. Upon reading the note, the victim believed that Mr. Gowen was going to sexually assault her to get back at the woman who had rejected him.

Mr. Gowen then performed a sort of strip tease dance and removed his clothes. He grabbed the victim by her hair, managed to get off the underwear she had worn to bed, and tried to force her to have oral sex with him. When she was able to avoid it, he attempted oral sex on her. As she struggled to get away, he became physically violent, slapping her back and buttocks and choking her. Suddenly he let her go and apologized. Shortly after that his mood changed and he began to choke her again, then released her and told her to be quiet and go to sleep. Subsequently, Mr. Gowen masturbated and attempted unsuccessfully several times to have sexual intercourse with the victim.

At about five o'clock a.m., Mr. Gowen asked the victim to go to breakfast, she agreed, and they began to get dressed. The victim dressed as quickly as she could, threw open the door, and ran down the hall. When Mr. Gowen ran ahead of her, she threatened to scream, ran back into the room, and shut the door. Mr. Gowen shouted through the door that he wanted his shoes. The victim put the chain on the door and started to open it to give him back the clothes he had left there, hoping that he would then go away. Mr. Gowen, however, began pushing on the door. She attempted to force it shut again and finally succeeded by beating on his hand with one of his shoes. With no telephone in the room, the victim ultimately managed to attract the attention of the hotel guests in the next room by shouting and pounding on a connecting door.

withstanding his decision to appear pro se. We find this assertion without merit.

Mr. Gowen assured the court at the hearing on his motion to proceed pro se that he was familiar with the law, had successfully represented himself in earlier criminal proceedings, and had more time to devote to his defense than the public defender. *See* rec., vol. VI, at 12. Moreover, the court cautioned Mr. Gowen before allowing him to proceed pro se that some barriers confronted him with respect to assistance from the public defender in locating and producing the large number of witnesses Mr. Gowen requested, and that "as your own defense counsel you may have some responsibility with regard to the location of these people and obtaining their presence here at trial if you feel that they should be testifying for you." Rec., vol. IV, at 18–19. Finally, the record reveals that the court granted Mr. Gowen numerous ex parte motions for subpoenas, and that the public defender did in fact provide substantial assistance to Mr. Gowen.

A ranger came up to the victim's room. While Mr. Gowen waited outside her door, she was interviewed by three rangers and pictures were taken of the bruises and marks on her body. Mr. Gowen and the victim were subsequently given rape test kit exams at a medical clinic. Mr. Gowen told authorities that he and the victim had engaged in rough, consensual sex.

## II.

Mr. Gowen alleges that his confrontational rights were violated because the government failed to disclose the results of a clinical interview and diagnostic tests that the government's expert witness conducted with the victim. The surrounding circumstances place this claim in perspective and reveal it to be without merit.

Toward the end of its case-in-chief, the government called Dr. Connie Best to the stand. Dr. Best was on the government's witness list, although Mr. Gowen did not receive her curriculum vitae until the day she was to testify. Mr. Gowen's standby counsel asked for a proffer of her testimony outside the jury's hearing to give Mr. Gowen an opportunity to object. The proffer revealed that Dr. Best has a degree in clinical psychology and specializes in post-traumatic stress disorder (PTSD). During the proffer, Dr. Best gave her opinion that the victim suffered from PTSD as a result of her experience with Mr. Gowen. She further stated that PTSD can cause a person to become confused, disoriented, and have difficulty remembering things. She stated that in her opinion, any inconsistencies in the victim's recitation of events to various authorities could have been caused by PTSD.

Dr. Best was cross-examined extensively during the proffer by standby counsel. She stated that she had interviewed the victim for a total of five hours over the previous two days and that her diagnosis was based on a diagnostic clinical interview and two diagnostic tests. Standby counsel then argued to the court that the expert's testimony on the reasons for any inconsistencies in the victim's story and for her failure to cry out or resist was irrelevant because the victim herself had explained her reasons to the jury on the stand. The judge expressed some sympathy with this argument but nonetheless ruled that Dr. Best could give her expert opinion. The court pointed out that credibility was an important issue in the case and that Dr. Best's specialized knowledge on the effects of PTSD would help the jury assess the victim's credibility.

Standby counsel then entered a continuing objection to this testimony on behalf of Mr. Gowen. Significantly, neither Mr. Gowen nor standby counsel argued to the court that Dr. Best's testimony came as a surprise or that the government had violated the court's discovery order. Moreover they did not request a continuance. Dr. Best took the stand and described the causes and symptoms of PTSD. She then answered two hypothetical questions based on the facts as set out in the victim's testimony. Dr. Best was not asked in front of the jury by either the government or Mr. Gowen whether in her opinion the victim did in fact suffer from PTSD.

On appeal, Mr. Gowen argues that the government's failure to disclose the results of the diagnostic tests and the interview conducted by Dr. Best during trial violated the court's discovery order.[2] This argument is controlled by our decision in *United States v. Edmonson,* 962 F.2d 1535, 1545–46 (10th Cir.1992). There, as here, evidentiary tests

---

**2.** Although Mr. Gowen asserts that he is not claiming surprise, that in fact appears to be the essence of his argument. To the extent that Mr. Gowen's allegation of error is premised on surprise, we point out again that he did not object below on this ground nor did he request a continuance. Moreover, standby counsel's extensive voir dire of Dr. Best out of the presence of the jury provided Mr. Gowen with an effective model for cross-examination of Dr. Best had Mr. Gowen

chosen to use it. Finally, Mr. Gowen had notice that Dr. Best was listed as a government witness. It was his responsibility in representing himself to ascertain her area of expertise and prepare to defend against it. *See Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975) (defendant who elects to represent himself cannot thereafter complain about the quality of his own defense).

which had been conducted after the trial had started were presented by the government in the middle of the trial. The defendant contended that admission of the "surprise" results was unfairly prejudicial and that the government's failure to perform the tests sooner violated Fed.R.Crim.P. 16(a)(1)(D), which requires the government to give the defendant access to such test results. We disagreed, stating "Rule 16 does not require that all scientific testing be conducted prior to trial. This Court has held that Rule 16 requires only that the Government disclose promptly any additional discovered evidence." *Id.* at 1546. Here, as required by *Edmonson,* the government did in fact promptly disclose the results of Dr. Best's diagnostic interview and testing results. Mr. Gowen's claim that he was unfairly prejudiced because Dr. Best's testimony undercut his defense based on the victim's lack of credibility is likewise precluded by *Edmonson.*

> "[T]here is no rule that evidence must be excluded or mistrial granted on the basis that a defendant had committed himself to a theory which was undermined by new evidence ... There is *always* a possibility that new evidence will be discovered, even if the defense was structured around assurances made by the government."

*Id.* (quoting *United States v. Atisha,* 804 F.2d 920, 925 (6th Cir.1986)). Moreover, neither Mr. Gowen nor his standby counsel asserted any impropriety by the government in this regard and the trial court thus made no inquiry on the matter. Accordingly, we find no reversible error in the admission of Dr. Best's testimony.[3]

### III.

■ Mr. Gowen also claims that his confrontational rights were violated by the government's failure to disclose the results of tests conducted on a penile swab taken as part of the rape test kit. Once again the circumstances generating this claim reveal it to be without merit.

The written report of the results of Mr. Gowen's rape test kit, including tests performed on the penile swab, were available to Mr. Gowen well before trial. They were presented to the jury through the testimony of the government's expert forensic serologist, Yvonne Woods. She testified on direct examination that she tested the swab for an indicator of saliva and for an indicator of seminal fluid. Although the swab tested positive for saliva, she was unable to determine whether it came from Mr. Gowen or the victim.

Mr. Gowen then began his cross-examination of Ms. Woods and immediately requested a discussion outside the presence of the jury at which he stated he did not know what the test results meant and asked whether they showed the presence of vaginal fluid.[4] Mr. Gowen expressed concern that the absence of vaginal fluid on the swab would suggest that he had lied about describing their encounter as consensual intercourse and would lend evidence to the victim's version of events. Standby counsel and the court indicated to Mr. Gowen their belief that Ms. Woods had simply not testified about the presence or absence of vaginal fluid on the swab. Standby counsel further stated:

> "There isn't anything conclusive there.... She may not have tested for it. That doesn't mean [vaginal fluids] didn't exist. That's a question—a decision of whether you want to ask that question. Right now

---

**3.** Mr. Gowen's argument that disclosure was required under *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), is both misguided and internally inconsistent. *Bagley* and the cases which came before it concern evidence favorable to the accused. *See id.* at 674–76, 105 S.Ct. at 3379–81. The evidence about which Mr. Gowen complains was clearly not favorable to him; indeed the gravamen of his argument is that he was prejudiced by its admission.

To the extent that Mr. Gowen is claiming that he was entitled to the raw results of the tests and interviews obtained by Dr. Best, his argument is precluded by his failure to request these results at trial and/or to request a continuance in order to have an opportunity to counter this evidence.

**4.** It appears from the record that vaginal fluid is detected through the presence in particular concentrations of chemical indicators. Thus, the bare test results required interpretation by someone with specialized knowledge.

there's no testimony to that effect, therefore it's not a question of whether you lied or not. There's no scientific evidence of its presence or its absence."

Rec., vol. XIII, at 16. After further inconclusive discussion between standby counsel and the government on whether the expert had in fact tested for vaginal fluid, Mr. Gowen decided to ask Ms. Woods if she had. Ms. Woods stated that she had tested for the chemical that would indicate vaginal fluid and that it was not present. She further stated that this test was only presumptive and that another test had been inconclusive.

After Ms. Woods' testimony, Mr. Gowen argued to the court that he had been misled by the government into stipulating on some aspects of the chain of custody of the rape test kit. The court held the chain of custody that had been established was adequate absent some evidence of tampering, which Mr. Gowen did not produce. Mr. Gowen further contended that he was misled by assurances from the government that the test results were inconclusive. The court rejected this argument, telling Mr. Gowen that the government had "no responsibility to tell you of the significance of evidence.... [the Assistant United States Attorney] did not mislead. He delivered the evidence to you and you had ample opportunity to do whatever research you wanted to do in that regard." Rec., vol. XII, at 163.

While acknowledging that he was given the test results, Mr. Gowen continues to argue on appeal that the government had a duty to interpret these results for him. He further contends that the government concealed the fact that one swab test for vaginal fluid had been negative. It appears from the record that the government was not concerned about a vaginal fluid test because the presence or absence of the fluid was not relevant to its prosecution. At trial, the government attorney represented to the court and to Mr. Gowen that he did not know whether the test had been performed. Presumably the forensic serologist performed the test as a matter of routine but did not put the results in her written report because she was not asked for them. We are hampered in our reconstruction of events, however, because Mr. Gowen did not create an adequate record on the matter. In any event, Mr. Gowen cannot excuse his failure to prepare a defense by blaming the government for refusing to do it for him. As stated in Part II, *supra*, having decided to represent himself, Mr. Gowen shouldered the responsibility for examining the evidence provided to him by the government and for preparing to counter that evidence. Given the significance Mr. Gowen placed on the test for vaginal fluid, it was his obligation to ascertain whether the test had been performed and if so whether the results were positive.

## IV.

Mr. Gowen raises numerous other claims of error, none of which have merit or require extended discussion. We therefore address them only briefly.

■ Mr. Gowen contends that his right to a fair trial was violated by the government's knowing use of perjured testimony. The alleged perjury involved in part the testimony of the victim and her attorney as to the possibility of a civil suit and the victim's motive to lie to further that suit. Mr. Gowen extensively explored this matter in his cross-examination of those witnesses. This court has held that even with more than a mere allegation of perjury, reversible error does not occur when, as here, the truthfulness of the alleged perjurers has been fully developed before the jury. *See United States v. Mathis*, 668 F.2d 1157, 1160–61 (10th Cir.), *cert. denied*, 456 U.S. 992, 102 S.Ct. 2275, 73 L.Ed.2d 1288 (1982).

■ Mr. Gowen also contends that in closing argument the government improperly misstated the testimony, drawing from facts not in evidence and from perjured testimony. The primary focus of Mr. Gowen's argument is his contention that the government attorney went outside the evidence at trial in stating that the life story Mr. Gowen recited

**1472**

to the victim included child molestation. The government concedes on appeal that although this evidence was contained in a statement given by the victim, it did not come in at trial. The government states that the erroneous reference was based on a good faith belief that the evidence had been admitted to the jury. Mr. Gowen did not make an objection on this ground below. Moreover, the jury was instructed that counsel's statements were not evidence, rec., vol. XV, at 21, and that the jury was to rely on its own recollection of the evidence rather than counsel's statements, *id.* at 26. We have carefully reviewed the government's closing argument in light of the entire trial transcript. We conclude that the single misplaced reference to child molestation, in place of a correct reference to incest, could not have had the required adverse affect on the fairness of the trial. *See United States v. Swafford,* 766 F.2d 426, 428–29 (10th Cir.1985).

Mr. Gowen also argues that he was denied a proper opportunity to prepare his closing argument, that the government and/or its witnesses circumvented the trial court's order on the admission of evidence under Fed. R.Evid. 404(b), that he was prejudiced by the testimony of government witnesses who gave coached and unresponsive answers, that the government improperly struck all attorneys from the jury, that the government concealed exculpatory evidence which Mr. Gowen claims he could have used to impeach the victim's credibility, that the government vouched for the victim during closing argument, and that his prosecution was vindictive and retaliatory. We have carefully reviewed these allegations of error and hold them to be without merit. Accordingly, the convictions are AFFIRMED.