STATE, Respondent v. PICKERING, Appellant

(207 N.W.2d 511)

(File No. 11034. Opinion filed May 25, 1973)

**Gordon Mydland,** Atty. Gen., **Walter W. Andre,** Asst. Atty. Gen., Pierre, S.D., **George Weisensee,** State's Atty., Minnehaha County, Sioux Falls, for plaintiff and respondent.

**Sidney B. Strange,** Sioux Falls, for defendant and appellant.

WOLLMAN, Justice.

Defendant was charged with the murder of one Lila Mae Scott. He was convicted by a jury of first degree manslaughter and was sentenced to 42 years' imprisonment in the state penitentiary.

Viewed in the light most favorable to the verdict, the evidence revealed that Lila Mae Scott, age 15, was dropped off

by a friend at Boyd's Grocery, located on Highway 77 just north of Sioux Falls, South Dakota, at approximately 6:45 p.m., Sunday, September 27, 1970. Sometime prior to 8 o'clock that evening, defendant and his brother Michael left defendant's home and drove to Boyd's Grocery for the purpose of buying some soft drinks. After the purchase had been made, defendant engaged in a conversation with Miss Scott, who was then standing outside the store. Miss Scott got into defendant's car. Defendant, Michael and Miss Scott drove to a tavern where defendant purchased some beer. After the three of them had spent some time driving around Sioux Falls drinking beer, they drove to Dell Rapids, South Dakota, where they purchased some more beer. From Dell Rapids they drove to Colton, South Dakota, and then back to Sioux Falls, where they arrived at approximately 10:30 p.m. that evening. Upon returning to Sioux Falls, the trio went to the Playboy Tap on North Phillips Avenue where they drank some more beer. As the three left the Playboy Tap at approximately 11 p.m., they met defendant's employer, Harvey Karlin, Jr., who had a short conversation with the defendant. Defendant then drove Michael to his home, which was located approximately one block from defendant's home. After Michael left the car, Miss Scott got into the front seat of the car from where she had been sitting in the back seat and she and the defendant drove away.

Shortly before noon on Tuesday, September 29, 1970, a fisherman found Miss Scott's body floating face down in the Big Sioux River at a point approximately 200 feet south of the bridge on Interstate Highway 90 north of Sioux Falls. External injuries consisted of many cuts on the face and several on the back of the head, bruises on the left forearm and a compound fracture of the middle finger on the left hand. The coroner (a pathologist) testified that it appeared as though Miss Scott had been struck with some blunt object. He testified that Miss Scott had suffered skull fractures and that there was a very good chance that she was unconscious at the time she was put into the river. He stated that the cause of death was drowning and that death had occurred during a period from 18 to 38 hours prior to 2:30 p.m. Tuesday, September 29, 1970.

The state's principal witness was Michael Pickering, defendant's brother. When Michael was first questioned by the Sioux

Falls police on October 12, 1970, he gave a written statement that implicated two of his friends in the slaying of Miss Scott. He gave another statement to the officers on October 13, 1970, which implicated defendant in the killing.

Michael testified that at approximately 9 a.m., Monday, September 28, 1970, defendant and his wife came to Michael's home. Defendant asked Michael to come with them and they drove north and east of Sioux Falls on Interstate 90. During the course of this drive defendant told Michael that he had killed Miss Scott by striking her with a flashlight and then with a tire iron. He pointed out to Michael the place where he had killed Miss Scott, which was at a point near the Interstate Highway bridge over the Sioux River north of Sioux Falls where the body was later found near a city water well. Michael testified that he could see some blood on the cement near the well house complex, blood that was later observed by the investigating officers.

The three returned to defendant's home at approximately 10 a. m. [1] Defendant showed Michael the clothes that he had worn on the previous evening; they appeared to have blood on them. Defendant took the clothes and shoes outside the house, poured some gasoline on them, and burned them. He then came into the house and got a styrofoam fishing bucket and took it outside. Defendant then returned to the house and asked Michael to come with him. Defendant placed the styrofoam bucket in the trunk of the car. Michael observed that the bucket contained what appeared to be ashes. Defendant, accompanied by his wife and Michael, drove to an area outside of Sioux Falls known as Cactus Hills. Defendant took the styrofoam bucket from the car and carried it over a hill into a ravine. [2]

Michael testified that he had seen a tire iron and a flashlight between the front bucket seats of defendant's automobile on

---

1. Although defendant normally went to work on Monday morning, he remained at home on September 28, 1970, giving his employer the excuse of illness.

2. On October 13, 1970, Michael led several police officers to the scene, where they recovered the styrofoam bucket from where it had been placed near an old car body at the bottom of the ravine. The bucket contained some ashes and a pair of badly burned shoes.

Sunday, September 27, 1970. He did not see the tire iron on Monday, September 28th, but he did see the flashlight between the front seats of defendant's car and observed that it was dented on the handle end. On Tuesday, September 29, defendant told Michael that he had gotten rid of the tire iron and flashlight by throwing them into the garbage truck that he drove at his place of employment.

According to defendant's version of the facts, he drove to his home at approximately midnight after the trip to the Dell Rapids-Colton area and the brief stop at the Playboy Tap. He told Michael that he could take Miss Scott home if he wanted to. Defendant went to bed and fell asleep. He was awakened sometime later when Michael returned in defendant's car and brought the car keys into the house. Defendant testified that he had never seen Miss Scott prior to the evening of September 27, 1970; and that he did not recall hearing her name during the course of their travels later that night.

Although defendant raises numerous claims in his assignments of error, only several of them warrant any extended discussion.

■ Defendant's claim that the evidence was insufficient to support the verdict is without merit. Although there were certain variances and inconsistencies between Michael's statement of October 13, 1970, and the testimony that he gave at the trial, the jury could well have found from his trial testimony, together with that of other witnesses for the state, that the events of the evening and night of September 27, 1970, as well as those of the following days, occurred as set forth above.

■ Prior to trial, defendant made a motion for an order requiring the state to furnish defendant virtually everything in the way of tangible and intangible evidence that the state might have concerning the case against defendant. The court's order entered pursuant to this motion granted defendant substantially what he had asked for; it denied that portion of the motion which had requested all investigative reports of members of the police department and other investigating officers, the names of

any persons privy to any statements of any proposed witnesses for the plaintiff and the substance of the statements overheard, and an opportunity on the part of defendant's counsel to view, and if requested, obtain copies of police logs, indexes and records kept in the ordinary course of police filing and recording. Defendant contends that the court erred in denying this portion of the motion to produce. We conclude that there was no abuse of discretion on the part of the trial court in refusing discovery of the above mentioned materials. State v. Wade, 83 S.D. 337, 159 N.W.2d 396. Much of what defendant desired to view and copy would of necessity have contained the subjective, impressionistic notes of the officers assigned to the case. We believe that the state divulged to defendant that which defendant was properly entitled to. We agree with the proposition that, "We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." Moore v. Illinois, 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706, 713. Accord, United States v. Brumley, 10 Cir., 466 F.2d 911.

During a conference in chambers at the conclusion of the state's case in chief, defendant's counsel renewed his motion that the state be required to disclose to the defendant any evidence favorable to the defendant. In response to this motion, the court extensively interrogated the state's attorney as to any specific items of evidence of which the state had knowledge that might be favorable to the defendant and was informed by the state's attorney that he knew of no such evidence. The state's attorney also informed the court and defense counsel that the state had talked to Michael Pickering's girl friend prior to trial and had learned from her that Michael had told her that defendant had killed Miss Scott. This person was not called as a witness by the state at the trial; in fact, there was an indication that the state did not know her whereabouts other than the fact that she had been in California. We think that this particular disclosure reflects the fact that the state fully and conscientiously complied with the court's written order to produce and that the state was completely candid in responding to the court's interrogation pursuant to defendant's oral motion. We are satisfied that the

requirements of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and Moore v. Illinois, supra, were complied with.

■ Defendant contends that he was prevented from effectively assisting in the preparation of his defense for trial by reason of the fact that the trial court ordered him incarcerated in the state penitentiary pending his trial. Defendant was arrested on October 14, 1970, and was held in the Minnehaha County jail until December 15, 1970, when, pursuant to an ex parte showing based upon affidavit, the court ordered defendant transferred to the custody of the warden of the South Dakota State Penitentiary. The affidavit stated that defendant had on various occasions flooded the cell block, broken windows, started fires, broken dishes, and in general caused disturbances of a nature which the Minnehaha County jail was unequipped to handle. The affidavit also stated that a danger existed that the defendant might escape from the county jail and that so long as he was confined therein he would continue to cause disturbances of a nature which would make it impossible to maintain proper discipline among the other inmates.

Conceding the fact that there apparently is no statutory provision authorizing the confinement of a defendant in the state penitentiary prior to conviction, we conclude that the court did not err in entering this order. State v. Orricer, 80 S.D. 126, 120 N.W.2d 528; State ex rel. Starnes v. Erickson, 85 S.D. 489, 186 N.W.2d 502. The record does not reveal that the defendant was put at any disadvantage in assisting his counsel as a result of being confined in the state penitentiary.[3] Indeed, the record does show that the defendant's attorney had made complaint to the court prior to the transfer that the facilities for attorney-client conferences at the Minnehaha County jail were inadequate; no such complaint was made with respect to the facilities at the state penitentiary. The only complaint made about defendant's confinement in the state penitentiary was an allegation that the marital visitation privileges were not so favorable as those at the Minnehaha County jail.

---

3. We take notice of the fact that the state penitentiary is located at Sioux Falls, South Dakota, the county seat of Minnehaha County.

■ Defendant contends that he was denied his constitutional right to a speedy trial because the court granted the state's request for a continuance until the May 1971 term of circuit court when it was discovered on the date the case was originally scheduled to go to trial, February 23, 1971, that the state's principal witness, Michael Pickering, could not be located. At the conclusion of the preliminary hearing, which was held in November of 1970, the state had served upon Michael Pickering a subpoena commanding him to appear at the opening day of the January 1971 term of circuit court. Upon his failure to appear at that time, the court issued a warrant for his arrest as a material witness on January 25, 1971. He was finally arrested and incarcerated on March 29, 1971.

Defendant has not alleged or demonstrated any specific prejudice as a result of the continuance. When all of the factors are considered and balanced, it is obvious that defendant suffered no constitutional deprivation of his right to a speedy trial. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101; State v. Starnes, 86 S.D. 636, 200 N.W.2d 244.

■ Defendant contends that he was prejudiced by reason of the state's reference to a polygraph test during its redirect examination of Michael Pickering. Prior to this redirect examination, a conference was held in chambers during which the state's attorney said that he intended to ask Michael to explain on redirect examination the inconsistent statements he had given to the police on October 12 and 13, 1970. The state's attorney disclosed that after Michael had given the first statement implicating two other persons in the death of Miss Scott, he was subjected to a polygraph examination which reflected that he was not telling the truth; when confronted with this evidence Michael broke down and told the police that defendant had killed Miss Scott. After objection by defense counsel, the court indicated that the state could ask Michael whether he was examined further after he had given the first statement. During the redirect examination of Michael on this matter, the court restricted the state to asking Michael whether he had been examined by the officers or by someone on behalf of the officers after he had given the first statement on October 12, 1970, and whether as a result

of the further examination he had agreed that he had lied in the first statement. We conclude that as restricted by the court, the state's questions did not make direct, explicit reference to a polygraph examination.[4]

■ Defendant contends that the court erred in permitting the state to grant Michael immunity from prosecution in the presence of the jury after Michael had asserted his constitutional privilege against self-incrimination. There is no merit in this contention. There was no objection by defense counsel at the time the motion to grant immunity was made. Defense counsel cross-examined Michael with respect to the grant of immunity and requested an instruction, which the court gave, to the effect that the fact that the state had granted immunity to Michael was not evidence of any kind against the defendant and did not create any presumption or permit any inference of guilt on the defendant's part.[5] Moreover, it might very well have been error had the jury not been apprised of the fact that Michael had been granted immunity from prosecution. Cf. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104; Burkhalter v. State, 1973, Tex.Cr.App., 493 S.W.2d 214.

We have considered defendant's other claims of alleged error and conclude that they are without merit. Accordingly, we affirm the conviction.

BIEGELMEIER, C. J., and HANSON and WINANS, JJ., concur.

DOYLE, J., not participating.

---

4. Such explicit reference to a polygraph test was held to be reversible error in Mattox v. State, 240 Miss. 544, 128 So. 2d 368, where several direct references were made to the fact that the state's key witness had taken a lie detector test. See also, People v. Andrews, 14 Cal.App.3d 40, 92 Cal.Rptr. 49, where it was held to be reversible error (when considered in conjunction with the prosecutor's misconduct on an unrelated matter) for the trial court to have asked a key prosecution witness whether he had taken a lie detector test and whether the charges against him had been dismissed after such test, to which the witness replied in the affirmative.

5. Counsel on appeal did not represent the defendant at trial.