**STATE of South Dakota, Plaintiff and Respondent,**

v.

**Vernon MOVES CAMP, Orville Milk and Alexander Richards, Defendants and Appellants.**

**Nos. 12541, 12546 and 12551.**

Supreme Court of South Dakota.

Argued Oct. 10, 1979.

Decided Dec. 24, 1979.

Rehearing Denied Jan. 28, 1980.

Leann Larson Finke, Asst. Atty. Gen., Pierre, Philip Hogen, Jackson County State's Atty., Kadoka, for plaintiff and respondent; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

T. Michael Carter, Rapid City, for defendant and appellant Moves Camp.

Bruce Ellison, Rapid City, for defendant and appellant Milk.

David P. Olson, Rapid City, for defendant and appellant Richards.

DUNN, Justice.

Defendants appeal from the final judgment of conviction rendered on May 30, 1978, by the Circuit Court of the Sixth Judicial Circuit within and for the County of Jackson. On change of venue, the trial was actually held in Pennington County. The trial court sentenced each of the defendants to twenty-five years' imprisonment on the first-degree robbery count and ten years' on the aggravated assault count, the sentences to run concurrently. We affirm.

Shortly after midnight on November 16, 1977, Charles Jakeway, an attendant at the Kadoka Standard Station in Kadoka, South Dakota, was approached by two young Indian women, who informed him that their car had gone into the ditch. Jakeway telephoned station owner Gary Vroman. Vroman proceeded to the service station with his wrecker. The women had walked back to their car, and Jakeway informed Vroman of the location of the car.

Vroman quickly towed the car out of the ditch and asked for twenty dollars—the standard fee for wrecker calls. Upon being informed that the group did not have twenty dollars, Vroman suggested that they proceed back to the station to "figure something out." Vroman positioned his wrecker so that he could follow the car back to the station.

At that point, two men got out of the car and approached Vroman's vehicle. Vroman was pulled from the wrecker and brutally beaten with a five-foot towing chain and a heavy metal "J-hook" one inch in diameter. He was robbed of his C.B. radio, police scanner, wristwatch, trucker's billfold and boots. After the beating, Vroman staggered back to the station and told Jakeway that "a couple of Indians beat me up." Jakeway called Deputy Sheriff Kenneth Heltzel, Jr., who immediately. drove Vroman to the Kadoka Hospital.

The attending physician noted that two, two-inch long scalp lacerations had penetrated to Vroman's skull lining, that he had sustained a left forearm fracture, that his eyes were swollen shut, that there was a one-inch laceration in the anterior neck and another in the posterior neck, that he had multiple lacerations on his hands and wrist, and that he had suffered a broken nose. After receiving emergency treatment in Kadoka, Vroman was transported to Regional East Hospital in Rapid City, South Dakota, where he remained for two weeks.

Deputy Heltzel summoned Deputy Tom Raymond to the Kadoka Hospital. Together they returned to the Standard Station to talk with Jakeway. Jakeway described the two Indian women and directed the officers to the scene of the incident. At the scene, the deputies picked up beer cans, a C.B. microphone and other physical evidence. They noticed blood on the C.B. box and the hood of the wrecker and electrical cords hanging from the dash of the wrecker. Finding no other evidence or suspect vehicles, they returned to the hospital, where Vroman informed them that the assailants' car was a late model blue Ford. There was some question whether Vroman stated that it was a 1966 or 1968 automobile. Heltzel had observed a vehicle fitting that description at about midnight in front of Room 11 of the A–1 Motel in Kadoka, where Bill Bronco Bill was residing with his sister Juanita. At the time Heltzel observed the vehicle, Alexander Richards was one of the occupants. Heltzel had made a mental note of the automobile because he had had prior contact with that car in the course of a criminal investigation near Interior, South Dakota, a few days before. Richards had been in Interior along with Vernon Moves Camp.

Heltzel visited the Bronco Bill residence, and Bill Bronco Bill confirmed that a blue Ford had been at the A–1 Motel. He stated that the car first appeared around 10:30 p. m. on November 15, 1977, that his sister had been with the occupants, that the blue car came back to the motel around midnight and then left, and that his sister had returned in the middle of the night, picked up her baby and some clothes and left again in the blue car.

Deputy Heltzel knew from his previous encounter with the blue Ford at Interior that it was registered to Vernon Moves Camp. The automobile involved in the instant case matched the one encountered at Interior, and for that reason the deputy called Wanblee, South Dakota, to obtain the license number of the Moves Camp vehicle. He radioed the license number to Pierre and confirmed that the license was indeed issued in the name of Vernon Moves Camp. The state's attorney was contacted to secure a John Doe arrest warrant, and an alert was broadcast over State Radio giving the license number of the Moves Camp vehicle, which was a 1967 blue Ford.

At 6:30 a. m., a blue 1967 Ford bearing the license number in question was stopped by Pennington County Deputy Sheriff Donny Pesecka as it approached Rapid City. Deputy Pesecka had been put on alert by the broadcast over State Radio. The occupants were frisked, arrested, taken to jail and read their rights. The occupants of the automobile were the three defendants, together with Juanita Bronco Bill and her baby, Tera Ringing Shield and Louis Moves Camp. The blue Ford was towed to the garage of the Pennington County jail, where it was sealed and impounded.

Upon her arrival at the Pennington County Sheriff's office and after being advised of her rights, Juanita was interviewed by Deputy Duane Plucker. The interview was taped and transcribed. The affidavit of

Juanita formed the basis for issuance of a search warrant to search the blue Ford. This search produced several items positively identified at trial as items taken from Vroman during the course of the assault.

In determining whether there is substantial evidence to support a conviction, this court must accept the evidence and favorable inferences which may be drawn therefrom in support of the verdict. The verdict will not be set aside if the evidence and the reasonable inferences drawn therefrom sustain a rational theory of guilt. *State v. Herrald*, 269 N.W.2d 776 (S.D.1978). It is not our function to resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence. These are jury functions. *State v. Minkel*, 89 S.D. 144, 230 N.W.2d 233 (1975).

Our initial determination is that "reasonable cause" was present and that the arresting officer was justified in his actions. The "reasonable cause" standard of SDCL 23-22-7(3) is legally equivalent to the Fourth Amendment requirement of "probable cause." *Reed v. United States*, 401 F.2d 756 (8th Cir. 1968); *Theriault v. United States*, 401 F.2d 79 (8th Cir. 1968). In *State v. Glick*, 87 S.D. 1, 201 N.W.2d 867 (1972), we discussed the "reasonable cause" standard at length. We cited numerous decisions of the United States Supreme Court that state that proof beyond a reasonable doubt is not required. While good faith on the part of the arresting officers is not enough, officers need only be reasonable and prudent, and they need not operate as legal technicians. *State v. Thunder Horse*, 85 S.D. 76, 177 N.W.2d 19, 21 (1970).

The probable cause for the stop and arrest by Deputy Pesecka was primarily the result of the police bulletin; thus the information warranting the issuance of the police bulletin by Deputy Heltzel becomes of first importance on the issue of probable cause.

Deputy Heltzel reasonably inferred that the beating had occurred as Vroman responded to a wrecker call. He had a physical description of the young Indian women who had asked for the tow, and he knew that Vroman had told Jakeway that "a couple of Indians" had beaten him. He knew the automobile involved was a 1966 or 1968 blue Ford. He had observed such a vehicle at the A-1 Motel earlier in the evening, and he knew that at least one Indian male, Alexander Richards, had been in the car at that time. It is significant to note that the deputy observed the automobile at the motel at "around 12:15 a. m.," and Vroman had responded to the wrecker call sometime between 12 and 12:30 a. m. It was reasonable therefore for Heltzel to assume that this automobile could very easily have been driven into the ditch at the approximate time of the incident. Additionally, the deputy learned from Bronco Bill that the automobile had left "sometime around midnight" with Bronco Bill's sister and some companions as occupants. Heltzel was not only aware that it was possible that the automobile could have been driven to the site of the incident at the time in question, he also knew that the automobile was absent from the motel during the crucial time period. The deputy could be reasonably certain at this point that there was at least one Indian male and one Indian female in the vehicle at the time it left the motel sometime after midnight. This information was helpful in accounting for the appearance of the female Indians at the service station and the presence of a male Indian at the site of the beating. Finally, the automobile the deputy observed at the motel was exactly like the one he had encountered a week before. Richards was in the car at the motel and had been in the car at the earlier encounter at Interior, and the deputy knew from the previous encounter that the car was registered to Vernon Moves Camp. Based upon this information, Heltzel acted reasonably in calling to obtain the license number of the Moves Camp vehicle. Likewise, it was reasonable for Deputy Pesecka to rely upon the State Radio bulletin in making the arrest. The automobile he observed matched the description and license number broadcast over the radio, and the occupants were Indians.

The cases cited by defendants do not sway us from concluding that reasonable cause for the arrest existed. In *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), the complaint that gave rise to the arrest was based upon an uncorroborated informant's tip. In the instant case, Deputy Heltzel was acting upon first-hand observations and information supplied by Vroman, Jakeway and Bill Bronco Bill. Heltzel had more compelling facts and circumstances than did the officers in *Whiteley*.

Furthermore, several decisions of this court lend credence to the state's theory of reasonable cause. In *State v. Klingler*, 84 S.D. 466, 173 N.W.2d 275 (1969), police were investigating a service station robbery committed by an unshaven man with sunglasses, dark pants and an olive-green shirt. The officers made inquiry of other service station operators in the area, and one attendant about one mile from the scene of the crime thought he remembered seeing an unshaven man earlier that evening in a brown and white 1957 Pontiac with Minnesota license plates and construction helmets in the back seat. Later that morning a person fitting the description of the suspect was arrested in a salmon and white Pontiac with South Dakota license plates. The arresting officer had relied upon the state bulletin, and the arrest was upheld. Admittedly, the arresting officer in *Klingler* had a more detailed description of the robber than did the officer in the present case. At the same time, however, the officer in *Klingler* made a lawful arrest even though the color and license plate of the automobile did not match those broadcast over the police radio. In addition, the description of the automobile in *Klingler* was obtained from a person who was neither the victim nor a witness to the crime. The station attendant who delivered the information to the police had merely made a note of the automobile because the occupants were acting suspiciously. We believe that the corroboration in this case is stronger in some respects than that in *Klingler* and weaker in others (such as the perpetrators' physical description). On balance, the corroboration in both cases was sufficient to constitute reasonable cause.

In *State v. Thunder Horse*, 85 S.D. 76, 177 N.W.2d 19 (1970), an officer arriving upon the scene of a beating and robbery was informed by the victim and three observers that the perpetrators were two Indian males and one white male and that they drove away in a light-colored 1955 or 1956 Buick. This bare information provided the officer with a clue as to who was involved, and he proceeded to the suspect's house and made the arrest. The arrest was deemed valid. It is true that the officer observed that one of the suspects had blood on his hands and clothing, but the officer had not made any firsthand observations as had the officer in the present case. We find the *Thunder Horse* case pertinent and persuasive, albeit different in some respects.

■ Two other South Dakota cases should be briefly mentioned. Although *State v. Boardman*, 264 N.W.2d 503 (S.D. 1978) is essentially an "investigative stop" case, it is relevant in establishing that an officer's knowledge that a suspect has had previous trouble with police is a permissible factor in justifying investigatory stops and establishing reasonable cause for arrest. In *State v. Catlette*, 88 S.D. 406, 221 N.W.2d 25 (1974), the fact that the officer had seen the defendant and the car in the neighborhood earlier that evening and knew that the defendant had previous convictions was a factor considered in assessing reasonable cause. Intuition alone is not enough, but an officer need not disregard observations he has made "on the beat" and prior experiences with individuals.

■ Defendants next argue that they were not informed of the charges against them as set forth in SDCL 23–22–9 when they were arrested. The court has construed this statute on several occasions to be merely directory, not mandatory. Failure to so advise a suspect does not invalidate the arrest. *State v. Klingler*, 84 S.D. 466, 173 N.W.2d 275 (1969), and *State v. Hackney*, 261 N.W.2d 419 (S.D.1978).

In holding that the arrest was proper, defendants' argument that Juanita Bronco Bill's statement, which formed the basis for the search warrant, was tainted by an illegal arrest is of no avail. Additionally, defendants have failed to prove their contention that the chain of custody of the car was not sufficient to allow introduction of its incriminating contents into evidence. The blue Ford in question was taken to the garage at the Pennington County jail. The car was sealed with evidence tape and locked behind doors with electric locks. Deputy Pesecka personally observed all of this. The car was transported to Kadoka by one Mr. Wilcox who testified that the tape had been temporarily removed to prepare the automobile for towing, that it was resealed before towing, and that it was driven directly to and locked within the Jackson County garage in Kadoka. These procedures satisfy us that a prima facie showing has been made that the objects were properly identified and in the same condition as when the car was taken into custody. The objects here were readily identifiable and relatively impervious to change. They are not fungible items. The standard set forth in State v. Christmas, 83 S.D. 506, 162 N.W.2d 125 (1968), has been met. The trial court has great discretion in regard to the competency of chain of custody evidence, and the jury did not find defendants' argument regarding the remote possibility of someone planting the evidence in the car to be credible. We are not inclined to upset these findings.

The affidavit of Juanita Bronco Bill did not have to measure up to the "Aguilar-Spinelli" test. Her status is similar to that discussed in State v. Roth, 269 N.W.2d 808, 811 (S.D.1978). Juanita was identified and was not an agent of the government. Like the informant in Roth, Juanita was not the victim nor was she a disinterested witness. She was closely associated with the defendants and with the events giving rise to the criminal charges, and as was the case in Roth, she had been granted immunity.

Defendants contend that the affidavit of Juanita was insufficient basis for the search warrant because some material statements therein were false when made and were made recklessly. In United States v. Luna, 525 F.2d 4 (6th Cir. 1975), the court stated that an assertion of recklessness must be substantiated by proof that (a) the statement being attacked was false when made, and (b) the affiant did not have reasonable grounds for believing the statement when made.

The statement here in question involves Juanita's observation of Tera Ringing Shield placing a radio in the blue Ford either during the course of or after the beating. Juanita further stated in the affidavit that the radio had been placed on the floor in the backseat, and after the Ford stopped back at the motel and Juanita had left the car to pick up some clothes and her child, the radio was no longer on the floor when she returned. At the preliminary hearing and at trial, Juanita made several statements indicating that she had not seen the radio as she had stated in the affidavit. Defendants contend that this shows recklessness in that the statements were false when made and Juanita did not have reasonable grounds for believing her affidavit statements to be true.

The cases dealing with recklessness cited by defendants all concern reckless statements made by government agents. While we do not condone reckless statements in affidavits by anyone, we believe private citizens, untrained in the art of technical observation, need not have their statements subjected to as rigorous an examination regarding recklessness as those of government agents. In addition, the cases cited by defendants all concern situations where the falsity of the affidavit statements was shown uncontrovertibly by means other than merely having the affiant testify that his previous statements may have been incorrect, as is the case here. We are inclined to give more weight to Juanita's affidavit statement than her statements at trial, which were given after a period of reflection regarding the possible consequences to her companions. Additionally, we believe that the fact that the radio

was actually found in the trunk of the automobile and that she was gone from the vehicle for a period of time before returning and finding the radio no longer in the backseat lends credence to the statements that she at one time saw the radio in the backseat. We are therefore not convinced of the falsity of the affidavit statement.

 The affidavit was otherwise sufficient, especially when viewing it, as we must, in a common-sense rather than a hypertechnical manner. Every reasonable inference possible must be in favor of a determination of probable cause. *State v. Kaseman*, 273 N.W.2d 716, 723 (S.D.1978). Accordingly, we conclude that the statements in Juanita's affidavit that "Tera told me to keep down and don't look" and that a radio was soon thereafter placed in the backseat show the probability of criminal activity. Finally, we conclude that Juanita's statement in the affidavit that the radio was not in the car after she had returned to the motel does not invalidate the subsequent search. The radio could easily have been, and apparently was, placed in the trunk during her brief absence.

 Defendants next contend that photographs of the victim were improperly admitted into evidence because of their prejudical and inflammatory nature. We must conclude that the trial court, which has great discretion in these matters, did not abuse its discretion and properly applied the standard of admissibility discussed in *State v. Disbrow*, 266 N.W.2d 246 (S.D.1978), and *State v. Zobel*, 81 S.D. 260, 134 N.W.2d 101 (1965).

 Defendants also allege denial of due process, claiming that the prosecution suppressed evidence. We conclude that the defendants were not prejudiced by any of the actions of the prosecution. The material evidence was made available to and used by the defense. First, the search warrants, return reports, and supporting affidavits were made available to the defense early in the trial. Additionally, previous statements by one defense counsel indicate that at least one member of the defense team had copies thereof before trial. Secondly, we are convinced that the negative fingerprint reports were disclosed in time for the defense to make effective use of them. In fact, by being allowed to present a disclaimer to the jury explaining opening statements that indicated the nonexistence of such reports, the defense was able to accentuate the negative fingerprint findings. Thirdly, the defense argument to the effect that it was Louis Moves Camp who was the assailant was incorporated into the final argument of the defense. Finally, the arrest reports that were allegedly submitted too late by the prosecution were introduced as defense exhibits, and we can see no prejudice arising therefrom.

It is important to note our statement in *State v. Sahlie*, 277 N.W.2d 591 (S.D.1979), that the rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requiring disclosure of material and exculpatory material applies only to situations where the defense discovers after trial that the prosecution had material information that remained undisclosed during the trial. We do not equate late disclosure with suppression, especially where, as here, the trial record indicates that defense counsel made use of the information at trial.

 The information that was allegedly never disclosed to the defense was not material. The State Radio log from midnight to 4:24 a. m. on the morning in question had been requested by the defense but was later found to have been erased by a radio operator. We are at a loss as to what material information could have been contained in this log. There is no evidence of deliberate destruction, as defendants freely admit. Good faith erasure of a tape does not deny a defendant a fair trial. *People v. Blair*, 195 Cal.App.2d 1, 15 Cal.Rptr. 533, 539 (1961). The taped interview with victim Vroman, although the tape was subsequently erased by the prosecution, was made available to the defense in the form of detailed notes taken at the interview by State's Attorney Hogen. The trial court allowed these notes to be given to the defendants even though he felt they were the

work product of the state's attorney. Furthermore, the taped interview with Juanita was heard by the trial court, and the court determined it to be a work product of the state containing no exculpatory material. This court has stated that there is no constitutional duty that the prosecution make a complete and detailed accounting of all police investigatory work. *State v. Pickering*, 87 S.D. 331, 207 N.W.2d 511, 514 (1973). The defendants' attempt to stretch the "duty to preserve" to require the state to collect and test every conceivable scintilla of physical evidence is not sound. In sum, defendants' claims of suppression of evidence, resulting in lack of a fair trial, do not reach the degree found in *State v. Sahlie*, 245 N.W.2d 476 (S.D.1976), or *United States v. Banks*, 383 F.Supp. 389 (D.S.D. 1974).

Finally, defendants' arguments that (1) their right to effective cross-examination was "very subtly" undermined by the court and prosecution, (2) late endorsement of jailer Bonning on the information was prejudicial, (3) the state's attorney's remarks in closing argument were improper, and (4) the court's instructions were improper, are all without merit.

The judgment is affirmed.

All the Justices concur.