2000 SD 3

**James WEDDELL, Petitioner and Appellant,**

v.

**Douglas WEBER, Warden, South Dakota State Penitentiary, Appellee.**

**No. 20740.**

Supreme Court of South Dakota.

Argued Oct. 19, 1999.

Decided Jan. 12, 2000.

*See also,* 498 N.W.2d 636.

Terry Pechota of Viken, Viken, Pechota, Leach & Dewell, Rapid City, South Dakota, Attorneys for petitioner and appellant.

Mark Barnett, Attorney General, Craig M. Eichstadt, Deputy Attorney General, Pierre, South Dakota, Attorneys for appellee.

SABERS, Justice.

[¶ 1.] James Weddell was convicted of first-degree manslaughter for the murder of Randy D. Caldwell and sentenced to 80

years in prison. After his direct appeal, he submitted an application for writ of habeas corpus. The habeas court denied him any relief but issued a certificate of probable cause. Weddell appeals and we affirm.

## FACTS

[¶ 2.] On February 28, 1986, twenty-seven year old Caldwell spent the day with friends in Wagner, South Dakota. It was established that a long-standing "Hatfields and McCoy" relationship existed between the Greger family and some Native American Indians in Wagner. The feud had been on-going throughout the day. That evening, Caldwell, a friend of Troy Greger, was ultimately engaged in a fistfight with Enos Weston while Greger was fighting Rayla Little.

[¶ 3.] While Caldwell was straddling Weston, Michael Honomichl and Weddell got out of a nearby-parked car, along with at least three other people, and ran towards the fight. Although the evidence was inconsistent as to what weapons they brandished, it is uncontroverted that both Honomichl and Weddell carried weapons. Greger testified that he saw Honomichl hit Caldwell in the side of the head with a jack. Witnesses at trial recounted that Weddell struck Caldwell once, twice or at least four times. Some witnesses testified that Weddell hit Caldwell with a wooden club, while at least one witness testified that Weddell used an iron bar. There was also testimony that Weddell struck Caldwell on the left side of his head. One witness testified that Weddell was the only person who struck Caldwell; he struck Caldwell so hard with a tire iron that Caldwell's body would jump. Within a few minutes of the arrival of Honomichl and Weddell, Caldwell was dead.

[¶ 4.] Dr. Brad Randall, a forensic pathologist, performed an autopsy on March 1, 1986. His final summary read, in part:

> At autopsy the principal finding is that of multiple injuries to the head and neck. The most prominent injury is that of a linear abrasion and contusion extending across the left side of the jaw and neck. The external injury patterns are those consistent with having been produced by a rounded blunt instrument. Associated with this point of impact is a fractured left mandible. Although no other bones including the skull are broken, the brain stem does show changes of blunt contusional injury. *The blow to the left side of the neck would appear to have been the most immediately fatal on the basis of brain stem concussion.*
>
> *      *      *      *      *      *
>
> The blow to the top right side of the head shows characteristics consistent with having been inflicted by the blunt end of a tire iron. This blow does not appear to have produced any significant underlying injury to the brain, although again, *the degree of brain injury often cannot be accurately ascertained when the individual dies shortly after the blow is sustained.*
>
> *      *      *      *      *      *
>
> The cause of death, therefore, in this case is head trauma consistent with that inflicted by a heavy rounded blunt instrument striking the decedent. The most severe and probably most immediately lethal injury was that sustained on the left side of the jaw and neck. The manner of death is consistent with homicide.

Autopsy report at 1–2, Exhibit 6 (emphasis added).

[¶ 5.] On March 5, 1986, Dr. Randall appeared before a grand jury and testified as to the cause of death of Caldwell. Dr. Randall testified that Caldwell sustained a broken jaw on the left side, "one large linear or straight abrasion with underlying bruising . . . over the left neck and jaw area, extending slightly back from the end of the jaw to behind the left ear," and "a second roughly circular area of bruising [sic] present over the right . . . temporal

parietal area." [1] Grand Jury Transcript at 3. A portion of the examination of Dr. Randall regarding the cause of death follows:

Q: Are you able to tell with a reasonable degree of medical certainty as to which of these major blows you've identified, or injuries to the skull and neck are, may have been the cause of this autonomic injury [the brain stem contusion]?

A: Yes.

Q: Which one?

A: The injury to the left side of the jaw was much more severe.

Q: All right. With regard to – it's more severe; are you ruling out the injury to the right side of the head as a possible cause?

A: I can't exclude it as a possible cause, but I do feel it's very unlikely that the injury, in and of itself, would have been lethal.

Grand Jury Transcript at 7. After all the testimony was offered, the grand jury returned an indictment in the matter of State v. James Weddell, Michael Honomichl and Enos Weston. The indictment was for murder in the second degree as well as manslaughter in the first degree.

[¶ 6.] Prior to trial, Weddell filed a motion to sever his case from his co-defendants. He argued that "it was possible that each co-defendant would implicate the other at a joint trial and severance was necessary to avoid prejudice to defendant." *See State v. Weddell*, 410 N.W.2d 553, 554 (S.D.1987). The trial court denied his motion and the case proceeded to trial.

[¶ 7.] On April 29, 1986, trial commenced. On the fifth day of trial, Weddell renewed his motion to sever the case. Again, the motion was denied. During trial, Dr. Randall testified that Caldwell's death was caused by multiple blows to the head. A portion of the examination follows:

Q: All right, the damage to the brain that you observed, do you have an opinion based upon a reasonable medical certainty as to the cause or causes of that damage?

A: Yes, I do.

Q: And what is your opinion, sir?

A: My opinion is that the damage to the brain sustained by the decedent is a result of multiple blows to the head.

Q: Would this include the blow or blows to the left side of the head?

A: Yes.

Q: And with regard to the left side of the head that you have testified to with regard to the State's Exhibits, are you able to tell the jury with any certainty how many blows [or blow] were struck?

A: There is evidence of possibly two blows. And I can't differentiate with extreme accuracy whether there were one or two blows sustained to the left side of the face.

Q: Are you able to determine based on your observations of the victim how many blows or a blow were struck to the right side of the head?

A: There was only evidence of one blow to the right side of the head.

Trial Transcript at 490–91. Upon cross-examination by Weddell's counsel, Dr. Randall testified that the blows sustained by Caldwell acted in concert to cause his death. This portion of the cross-examination follows:

Q: Am I to understand from your testimony here today that the blow to the right side of the head would in your opinion not be the killing blow? The fatal blow?

A: No, I don't believe that was my testimony.

Q: Well, as I understand it, the blow to the left side of the jaw also created problems to the brain stem of the victim; is that correct?

---

1. The temporal parietal area was described as that "zone between the top of the head and the top of the ear...." Grand Jury Transcript at 3.

A: That is correct.

Q: And it was that particular area of the skull, of the brain stem, that controls the breathing and the pulse and so forth?

A: That's correct.

Q: And that that type of blow could in fact cause someone to die instantly; is that correct?

A: That's correct.

Q: The blow on the right side of the head, on the other hand, there was no skull fracture there; was there?

A: No, there was not.

Q: And no underlying brain injury, was there?

A: Again, there was no evident underlying brain injury. It is very difficult when someone dies shortly after a blow is sustained to sometimes tell whether there has been brain injury or not. *Certainly the blow to the left side of the head was the most severe. My testimony though is that I cannot determine what contributory effect the blow to the right side of the head may have had.*

Q: But it is your testimony that the blow to the left side of the head would have been more likely to have been the fatal blow?

A: Well, what I'm trying to impart is, that these blows acted in concert. And that it may not be medically accurate to separate out the effects of one versus the other. *Certainly the effect of the left side of the jaw was more severe, but the blow to the right side of the head may well have contributed to some degree to the ultimate death of the decedent.*

Trial Transcript at 497–98. (emphasis added). Dr. Randall testified that the injury inflicted to the left side of Caldwell's head would have been caused by a car jack while the injury to the right side would have been inflicted by a tire iron.

[¶ 8.] Weddell took the stand in his own defense and testified that he hit Caldwell in the lower body with a wooden club, but never hit him in the head. In fact, on cross-examination, he was asked where exactly he hit Caldwell and he replied: "I can't tell you exactly, but it wasn't – it wasn't in the head, that is for sure." He further testified that Honomichl delivered the fatal blow to the left side of Caldwell's head with the shaft and ratchet assembly of a car jack. On the other hand, Honomichl testified that he carried only a red funnel and swung at Caldwell with his fist, but missed. He further testified that Weddell struck Caldwell with a wooden club on the left side of Caldwell's head; then, once Caldwell fell, Weddell struck him a second time.

[¶ 9.] There was also testimony regarding the sounds of the blows being struck. One witness testified that he heard a popping sound when Weddell hit Caldwell. Dr. Randall associated this sound with the blow to the left side of Caldwell's head. The witness also heard a thump or hollow sound when Honomichl hit Caldwell. Dr. Randall associated this sound with the blow to the right side of Caldwell's head.

[¶ 10.] After the fight, one witness testified that Weddell stated to him: "I got him for you." Another witness testified that Weddell stated: "Did you see that, just one hit." One witness overheard one defendant say, "Let's go, we got the one we want."

[¶ 11.] Upon the conclusion of the trial, the jury found both Honomichl and Weddell guilty of first-degree manslaughter.[2] A judgment of conviction was entered June 30, 1986. Weddell was sentenced to 80 years in the South Dakota State Penitentiary.[3] Weddell appealed his case argu-

2. The third defendant, Enos Weston, made a motion for judgment of acquittal at the close of State's case and it was granted.

3. Weddell was at the South Dakota State Penitentiary from July 1, 1986 until May 27, 1987, the date he escaped. He was apprehended and served time in Marion, Illinois from October 25, 1989 until December 29, 1992 when he returned to the South Dakota

ing: (1) the trial court's denial of his motion to sever unfairly prejudiced his right to a fair trial; and (2) the trial court erred in refusing to grant his motion for judgment of acquittal based on insufficient evidence. His conviction was affirmed on direct appeal to the South Dakota Supreme Court. *See Weddell*, 410 N.W.2d at 557.

[¶ 12.] Nine years after the trial, James Weddell filed his application for writ of habeas corpus. On November 24, 1997, the habeas court denied any relief to Weddell, but issued a certificate of probable cause. He appeals asserting five issues:

1. Whether the trial court was clearly erroneous in finding that the State provided Weddell with the complete results of the autopsy as well as Dr. Randall's opinion.

2. Whether the trial court was clearly erroneous in refusing to grant either Weddell's motion for acquittal or motion for mistrial after Dr. Randall "changed" his testimony.

3. Whether Weddell was denied effective assistance of counsel.

4. Whether the State improperly dismissed Ella Huapapi, a Native American Indian, from the jury pool in violation of *Batson v. Kentucky*.

5. Whether Weddell's trial should have been severed from Honomichl's trial.

### STANDARD OF REVIEW

[¶ 13.] Our standard of review for a habeas appeal is well established.

Habeas corpus is not a substitute for direct review. Because habeas corpus is a collateral attack upon a final judgment, our scope of review is limited. On habeas review, the petitioner has the initial burden of proof. We review the habeas court's factual findings under the clearly erroneous standard.

State Penitentiary. He is still incarcerated in the South Dakota State Penitentiary.

4. This portion of the examination follows:

*Sund v. Weber*, 1998 SD 123, ¶ 12, 588 N.W.2d 223, 225 (quoting *Lodermeier v. Class*, 1996 SD 134, ¶ 3, 555 N.W.2d 618, 621–22 (citations omitted)).

[¶ 14.] **1. WHETHER THE TRIAL COURT WAS CLEARLY ERRONEOUS IN FINDING THE STATE PROVIDED WEDDELL WITH THE COMPLETE RESULTS OF THE AUTOPSY AS WELL AS DR. RANDALL'S OPINION.**

[¶ 15.] Weddell does not claim that he did not receive a copy of the autopsy report. Instead, he argues that the State did not disclose the opinion of its expert witness, Dr. Randall. Weddell asserts that Dr. Randall's grand jury testimony was that "the blow on the left was the fatal blow and the blow on the right did not contribute to the death." During trial, Dr. Randall testified that the blow on the right was a contributing factor to the cause of Caldwell's death. Weddell argues that this "change" in testimony was required to be made known to him prior to trial pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He further argues that his defense was "devastated" by this surprise testimony.

[¶ 16.] The habeas court found that "any variance or discrepancy . . . was minor and, therefore, the nature of Dr. Randall's trial testimony was not, or should not have been, a surprise to [Weddell]." The habeas court further found that "any variance or discrepancy . . . was not material to [Weddell's] defense since [he] was claiming that he only hit Caldwell on the body and that [he] did not strike him in the head."

[¶ 17.] As set forth above, Dr. Randall stated, during the grand jury trial, that he could not exclude the injury to the right side of Caldwell's head as a possible cause of Caldwell's death.[4] We do not interpret

Q: All right. With regard to – it's more severe; are you ruling out the injury to the right side of the head as a possible cause?

Dr. Randall's testimony to say that "the blow on the left was the fatal blow and the blow on the right did not contribute to the death," as Weddell argues. It means what it says – the injury to the right side could not be excluded as a possible cause of death. Furthermore, during trial, Dr. Randall testified that while the injury on the left side was more severe, the injury on the right side may have contributed to Caldwell's death. This is not a substantial deviation from his grand jury testimony.

■ [¶ 18.] Weddell also argues that the State violated the *Brady* rule. This court has recently stated:

> It is important to note our statement in *State v. Sahlie,* 277 N.W.2d 591 (S.D. 1979), that the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requiring disclosure of material and exculpatory material applies only to situations where the defense discovers after trial that the prosecution had material information that remained undisclosed during the trial.

*State v. Knecht,* 1997 SD 53, ¶ 18, 563 N.W.2d 413, 420 (quoting *State v. Fox,* 313 N.W.2d 38, 40 (S.D.1981)) (quoting *State v. Moves Camp,* 286 N.W.2d 333, 339 (S.D. 1979)). The United States Supreme Court has held that when the prosecutors fail to disclose evidence favorable to the defendant, a *Brady* violation has been committed "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985). A four-part test is used to determine whether a prosecutor's suppression of evidence led to a due process violation:

1. Was the defense unaware of the evidence?

2. Is the evidence favorable to the defense?

3. Is the evidence material to the defense?

4. Did the defense make a request for the evidence?

*Knecht,* 1997 SD 53, ¶ 17, 563 N.W.2d at 420 (quoting *Black v. Class,* 1997 SD 22, ¶ 16, 560 N.W.2d 544, 548) (citing *State v. Fowler,* 1996 SD 79, ¶ 22, 552 N.W.2d 391, 395 *(Fowler II)*) (other citation omitted). "All four of these questions must be answered affirmatively." *Id.* (citing *State v. Fowler,* 1996 SD 78, ¶ 22, 552 N.W.2d 92, 96 *(Fowler I)*).

[¶ 19.] In this case, a *Brady* violation never occurred. The prosecution did not conceal the opinion of Dr. Randall from Weddell. In fact, Dr. Randall's opinion at trial did not substantially deviate from his testimony at the grand jury trial. *Compare Fullmer v. State Farm Ins. Co.,* 498 N.W.2d 357, 361–62 (S.D.1993) (determining that the defense's medical expert witness did substantially change his opinion at trial from the opinion he rendered at his deposition).

[¶ 20.] The habeas court was not clearly erroneous in determining that (1) there was no substantial change in Dr. Randall's testimony and (2) such deviation was not substantially material to Weddell's defense. We affirm Issue 1.

[¶ 21.] **2. WHETHER THE TRIAL COURT WAS CLEARLY ERRONEOUS IN REFUSING TO GRANT EITHER WEDDELL'S MOTION FOR ACQUITTAL OR MOTION FOR MISTRIAL AFTER DR. RANDALL "CHANGED" HIS TESTIMONY.**

■ [¶ 22.] Weddell argues that his motion for a mistrial should have been granted because the State did not advise him of the "change" in Dr. Randall's testimony; i.e. that the blow to the right side of Caldwell's head did contribute to the death of Caldwell. Weddell's motion for acquit-

---

A: I can't exclude it as a possible cause, but I do feel it's very unlikely that the

injury, in and of itself, would have been lethal.

tal was based on the same grounds. In short, Weddell argues that his "constitutional 'right to the best possible defense' was violated by the failure to grant the motion for mistrial."

[¶ 23.] We determined, in Issue 1, that Dr. Randall did not substantially change his testimony from the time he testified at the grand jury proceeding to the time he testified at trial. Therefore, the trial court did not abuse its discretion in denying these motions.

[¶ 24.] We affirm Issue 2.

## [¶ 25.] 3. WHETHER WEDDELL WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

We have adopted the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for ineffective assistance of counsel claims. First, [the applicant] must prove that his trial counsel's performance was deficient. He must show that trial counsel made errors 'so serious that counsel was not functioning as the "counsel" guaranteed ... by the Sixth Amendment.' Secondly, he must show that the deficient performance 'prejudiced the defense' by showing that 'counsel's errors were so serious as to deprive the defendant of a fair trial[.]' The reasonableness of trial counsel's action is evaluated from his perspective at the time the alleged error occurred.

*Wayrynen v. Class*, 1998 SD 111, ¶ 17, 586 N.W.2d 499, 502 (quoting *Garritsen v. Leapley*, 541 N.W.2d 89, 93 (S.D.1995)) (alterations in original) (citations omitted). "Prejudice exists when there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* ¶ 23 (quoting *Petrilli v. Leapley*, 491 N.W.2d 79, 85 (S.D.1992) (citations omitted)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Loop v. Class*, 1996 SD 107, ¶ 14, 554 N.W.2d 189, 192 (citations omitted).

[¶ 26.] The habeas court found that Weddell's trial counsel, Lee A. Tappe, did not fall below the objective standard of reasonableness and did provide effective assistance of counsel to Weddell. In its findings of fact, the habeas court stated, in part:

11. That attorney Tappe's decision to not employ an expert on behalf of the Petitioner to rebut the testimony of Dr. Randall was a strategic decision reasonably based upon the Petitioner's claim that he had not hit Caldwell in the head, leading Tappe to the conclusion that it did not matter whether Dr. Randall testified which blow or combination of blows to the head ... was/were the cause of death.

12. That there is no evidence attorney Tappe failed to investigate and consider possible defenses or that he failed to exercise his good faith judgment thereon.

13. That attorney Tappe's decision to not secure an expert to rebut the testimony of Dr. Randall did not fall below an objective standard of reasonableness.

14. That the Petitioner was not prejudiced by attorney Tappe's failure to move for a continuance so that an expert could be appointed or by his failure to move to strike Dr. Randall's testimony as said motions would have been denied by the trial court.

[¶ 27.] In reviewing a habeas court's determination of ineffective assistance of counsel, we have stated:

Whether a defendant has received ineffective assistance of counsel is essentially a mixed question of law and fact. In the absence of a clearly erroneous determination by the circuit court, we must defer to its findings on such primary facts regarding what defense counsel did or did not do in preparation for trial and in his presentation of the defense at trial. This court, however, may substi-

tute its own judgment for that of the circuit court as to whether defense counsel's actions or inactions constituted ineffective assistance of counsel.

*Wayrynen,* 1998 SD 111, ¶ 18, 586 N.W.2d at 502 (quoting *Loop,* 1996 SD 107, ¶ 11, 554 N.W.2d at 191) (citation omitted).

[¶ 28.] Weddell argues that Tappe was deficient in: (1) not objecting to the "changed" testimony of Dr. Randall; (2) not making a motion to strike Dr. Randall's "changed" testimony; (3) not making a motion for a continuance after hearing Dr. Randall's "changed" testimony; and (4) not retaining an expert pathologist to rebut Dr. Randall's testimony that the blow to the right side may have contributed to Caldwell's death.

[¶ 29.] Issue 1 disposes of the argument that Dr. Randall substantially "changed" his testimony at trial. We hold that he did not. Therefore, Weddell's arguments here relating to that issue are also without merit. We address only the argument that Tappe was ineffective in not retaining an expert witness.

[¶ 30.] In preparing for this habeas, Weddell retained two expert witnesses who testified that the injury to the right side was not fatal. In his brief, Weddell stresses the importance of having an expert witness at trial:

An expert would have insured that the State prove that one or the other of the defendants struck the blow on the left. It would also have insured that only one defendant would have been convicted. To not take the necessary action to significantly diminish, as an expert would have done in this case, the chances of your client getting convicted of murder must be as a matter of law ineffective assistance of counsel in South Dakota.

He also retained an attorney who testified that it was ineffective assistance of counsel to fail to secure the services of an expert pathologist.

[¶ 31.] However, during the hearing on the writ of habeas corpus, Weddell still maintained, as he did during trial, that he did not strike Caldwell in the head:

A: Well yes. [I][l]eft [the defense] to Tappe. It was Dr. Randall's autopsy report and Grand Jury testimony [that] said that there was only one lethal blow, fatal blow delivered to the left side of the face of Randy Caldwell. And I didn't hit him on the left side.

Q: Caused by?

A: Caused by [a] metal object. A jack. And –

Q: Okay. So how was that significant to your defense then?

A: Well, I never hit him on the left side.

Q: All right.

A: I hit him on – below the shoulders on the right side. To disarm him. (Indicating).

On cross-examination, he reiterated that he did not strike Caldwell in the head or in the neck area. However, in Weddell's brief, he states:

The whole defense was based on the theory that the blow on the left was the one causing the death of Caldwell. Only one blow caused the death of Caldwell and there were two defendants. An expert, had one been retained, would have been available to testify if the need arose, as it did.

Despite the claims in his brief, the trial strategy was to prove that Weddell did not strike Caldwell in the head.

[¶ 32.] Given his defense that he did not even hit Caldwell on the head, expert witness testimony may not have helped him at trial. However, it may have been better practice to argue alternatively that, if the jury found his blows *were* to the head, then, in that event, Weddell still could not be convicted of first degree manslaughter, unless the jury also found the blow or blows to the head contributed to Caldwell's death. Nevertheless, we have previously stated: "the defendant must show more than that the trial strategy of the defense

counsel backfired or that another attorney would have prepared and tried the case in a different manner." *Loop*, 1996 SD 107, ¶ 18, 554 N.W.2d at 192 (quoting *Aliberti v. Solem*, 428 N.W.2d 638, 640 (S.D.1988)). "This [c]ourt will not second guess the strategic decisions of trial attorneys." *Id.* It appears reasonable that Tappe proceeded to trial with the defense that his client, Weddell, did not strike the victim in the head; it is, afterall, the same defense that Weddell maintained in his habeas hearing. "[T]he [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted). Weddell did not overcome this presumption nor did he show that the findings of the habeas court were clearly erroneous. Therefore, we affirm.

## [¶ 33.] 4. WHETHER THE STATE IMPROPERLY DISMISSED ELLA HUAPAPI, A NATIVE AMERICAN INDIAN, FROM THE JURY POOL IN VIOLATION OF BATSON V. KENTUCKY.

[¶ 34.] Weddell argues that the State acted with purposeful discrimination when exercising a peremptory challenge on a Native American Indian woman. This same issue was addressed in Honomichl's habeas. *See Honomichl v. Leapley*, 498 N.W.2d 636 (S.D.1993) (a three-to-two decision that the State had proven that the removal of Huapapi from the jury pool was for a race neutral reason and Honomichl did not prove that the reason was pretextual). The entire jury selection evidence from Honomichl's habeas was incorporated into the record in this habeas corpus action of Weddell. No new evidence was offered or received and nothing new was added to the record.

[¶ 35.] The same result is reached here. The majority decision in *Honomichl v. Leapley*, 498 N.W.2d 636, 637–42 (S.D. 1993) is incorporated herein on this Issue by this majority. By the same token, Jus-

tice Sabers' dissent thereto is also incorporated.

[¶ 36.] Therefore, this Issue is affirmed.

## [¶ 37.] 5. WHETHER WEDDELL'S TRIAL SHOULD HAVE BEEN SEVERED FROM HONOMICHL'S TRIAL.

[¶ 38.] Weddell raised this same issue on direct appeal. *See Weddell*, 410 N.W.2d at 554. In that case, he argued that the "denial of his severance motions prejudiced his right to a fair trial." *Id.* The alleged prejudice stemmed from Weddell's beliefs that the "co-defendants might incriminate each other and thereby present 'antagonistic' defenses." *Id.* This court, on direct appeal, stated:

> In this case the defenses were not irreconcilable. The [S]tate's expert witness testified that Caldwell died from multiple blows to the head. Numerous witnesses testified that both Honomichl and defendant stuck Caldwell with clubs. *This is not the case where only one blow caused death and each defendant accuses the other of the fatal blow.*

*Id.* at 555 (emphasis added). Weddell now argues that this claim is not barred by res judicata because he has expert witnesses who have testified, in preparation for this habeas, that the blow on the left side of Caldwell's head was the sole cause of his death and the blow to the right side had no contributing significance to Caldwell's death. Thus, Weddell argues that this is, in fact, a case where only one blow caused Caldwell's death and each accuses the other of delivering the fatal blow.

[¶ 39.] Clearly, the doctrine of res judicata applies to habeas corpus proceedings. SDCL 21–27–16.1; *Cochrun v. Solem*, 397 N.W.2d 94, 96 (S.D.1986) (citations omitted). We have previously stated:

> It is settled law in South Dakota that a judgment subject to res judicata 'constitute[s] an absolute bar against the prosecution, not only of every claim or demand therein in controversy, *but also of*

*all other admissible matters that might have been offered to sustain or defeat such claims or demands.'*

*Cochrun*, 397 N.W.2d at 96 (quoting *Schell v. Walker*, 305 N.W.2d 920, 923 (S.D.1981)) (emphasis added) (citations omitted). "The motion to sever is addressed to the sound discretion of the trial court, and a denial of severance is not grounds for reversal unless clear prejudice and an abuse of discretion are shown." *Weddell*, 410 N.W.2d at 554–55 (citations omitted).

[¶ 40.] Severance would be required only if "the defendants present conflicting and *irreconcilable* defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Id.* at 555 (emphasis in original) (citations omitted). The new evidence marshaled for the habeas hearing was not presented to the jury; therefore, it is not considered. What the jury did consider was that the victim sustained multiple blows to his head which resulted in his death. Both defendants denied striking Caldwell in the head. However, the evidence showed that either defendant may have delivered the blow to the left side of Caldwell's head and the blow to the right side of his head may have contributed to his death. The defenses were not irreconcilable; i.e. mutually exclusive. Therefore, our previous decision stands:

> The testimony by the State's expert witness and numerous eyewitnesses permitted the jury to find both defendants guilty without having to infer both were guilty based merely on the conflict alone. We therefore hold denial of defendant's motions for severance was not clearly prejudicial or an abuse of discretion.

*Id.* This issue is disposed of under the res judicata doctrine.

[¶ 41.] Issue 5 is affirmed.

[¶ 42.] In summary, we affirm all Issues.

[¶ 43.] MILLER, Chief Justice, and AMUNDSON and GILBERTSON, Justices, concur.

[¶ 44.] KONENKAMP, Justice, concurs in result.

KONENKAMP, Justice (concurring in result).

[¶ 45.] I concur with the majority opinion in affirming Issues 1, 2, 3 and 5. I concur in result on Issue 4. While I do not agree that *Honomichl v. Leapley*, 498 N.W.2d 636 (S.D.1993), necessarily controls the *Batson* issue here, I believe our examination of the question requires lesser scrutiny on habeas corpus review. *See Flute v. Class*, 1997 SD 10, ¶ 11, 559 N.W.2d 554, 557 (court exercises decreasing scrutiny as time passes). At the time Ms. Huapapi's name was stricken, the defense made no objection. Now, more than a decade after the trial, we are called on to decide if the decision to strike her name was purposefully discriminatory. The prosecutor's explanation for striking her name appears inadequate under *Batson*. If the matter had been challenged on direct appeal after the issue had been properly preserved, I would probably be compelled to hold that exclusion of Ms. Huapapi was improper, and not subject to harmless error analysis. *Brecht v. Abrahamson*, 507 U.S. 619, 629–30, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353, 367–68, *reh'g denied*, 508 U.S. 968, 113 S.Ct. 2951, 124 L.Ed.2d 698 (1993); *Batson v. Kentucky*, 476 U.S. 79, 100, 106 S.Ct. 1712, 1725, 90 L.Ed.2d 69, 90 (1986). Indeed, the Eighth Circuit Court of Appeals found in a habeas appeal that a prosecutor's race-based peremptory challenges of jurors and alternates was a "structural defect" not susceptible to harmless error analysis. *Ford v. Norris*, 67 F.3d 162, 171 (8thCir.1995).

[¶ 46.] Nonetheless, no court has suggested that trial judges must *sua sponte* intervene to prevent discriminatory exclusion of jurors. On the contrary, *Batson* requires a timely objection. *See Ford v. Georgia*, 498 U.S. 411, 422, 111 S.Ct. 850,

857, 112 L.Ed.2d 935, 948 (1991). A "requirement that any *Batson* claim be raised not only before trial, but in the period between the selection of the jurors and the administration of their oaths is a sensible rule." *Id.*

[¶ 47.] As there was no objection, we review this matter not for harmless error, but plain error. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of a court." SDCL 23A–44–15 (Rule 52(b)). As we said in *State v. Nelson,* 1998 SD 124, ¶ 7, 587 N.W.2d 439, 443, "[u]nlike harmless error review under SDCL 23A–44–14 (Rule 52(a)), in which the State has the burden of proving the error was not prejudicial, with plain error analysis the defendant bears the burden of showing the error was prejudicial." (citing *United States v. Olano,* 507 U.S. 725, 737–41, 113 S.Ct. 1770, 1779–81, 123 L.Ed.2d 508 (1993), *aff'd in part, rev'd in part,* 62 F.3d 1180 (9thCir.1995), *cert. denied,* 519 U.S. 931, 117 S.Ct. 303, 136 L.Ed.2d 221 (1996)). In *Nelson,* we also explained:

> Plain error requires (1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." We invoke our discretion under the plain error rule cautiously and only in "exceptional circumstances." Such circumstances may include cases in which "'a miscarriage of justice would otherwise result,'" i.e., a defendant is actually innocent.

*Id.* ¶ 8 (alteration in original) (internal citations omitted).

[¶ 48.] Under plain error analysis, Weddell bears the burden of proving that this mistake must be corrected because "a miscarriage of justice would otherwise result." *Id. See United States v. Contreras–Contreras,* 83 F.3d 1103 (9thCir.1996) (applying plain error analysis to defendant's *Batson* claim raised for the first time on appeal). Furthermore, because this conviction is

under collateral attack, we are more at liberty to explore whether the exclusion of Ms. Huapapi was prejudicial to Weddell. Although the prosecutor's explanation for striking her was unsustainable under *Batson,* there is nothing in his answer that suggests an inherent discriminatory intent. *See Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 406 (1991); *see also Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839, *reh'g denied,* 515 U.S. 1170, 115 S.Ct. 2635, 132 L.Ed.2d 874, *and on remand,* 64 F.3d 1195 (8thCir.1995). In the habeas hearing, the circuit court believed the prosecutor's explanation. The court had the opportunity to observe his demeanor and judge his credibility. Certainly the court's fact findings are entitled to some deference. *See Contreras–Contreras,* 83 F.3d at 1105–06. After carefully considering the issue, I must state that Weddell has not met his burden of showing that a grievous injustice occurred. In fact, he makes no showing that had Ms. Huapapi remained on the jury the outcome would have been different.

[¶ 49.] Accordingly, I concur in affirming, but for reasons other than those stated by the majority.