James **WEDDELL**, Petitioner,

v.

Douglas **WEBER**, Warden, South Dakota State Penitentiary; and Mark Barnett, Attorney General, State of South Dakota; Respondents.

No. CIV. 00–4087.

United States District Court,
D. South Dakota,
Southern Division.

Sept. 29, 2003.

Terry L. Pechota, Pechota, Leach & Dewell, Rapid City, for Plaintiff.

Craig M. Eichstadt, Mark W. Barnett, Attorney General's Office, Pierre, for Defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

The petitioner, James Weddell, who is currently an inmate at the South Dakota

State Penitentiary, has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons stated below, the petition is granted on two of Weddell's five claims.

## BACKGROUND

James Weddell was convicted of first-degree manslaughter in connection with the death of Randy Caldwell and sentenced to 80 years imprisonment. *See Weddell v. Weber,* 604 N.W.2d 274 (S.D. 2000) (state habeas); *State v. Weddell,* 410 N.W.2d 553 (1987) (direct appeal). The facts relevant to Weddell's current habeas petition are set forth below.

On February 28, 1986, Randy Caldwell was participating in a day-long fight between the Greger family and some Native Americans in Wagner, South Dakota. At the time in question, Caldwell was engaged in a fistfight with Enos Weston while his friend, Troy Greger, was fighting Rayla Little. During the fight, Michael Honomichl and Weddell got out of a car and ran towards the fight carrying weapons and proceeded to beat Caldwell. A few minutes later, Caldwell was dead. Weddell and Honomichl were tried in the same case and convicted of first-degree manslaughter.

The report of Dr. Brad Randall, the forensic pathologist who performed the autopsy of Caldwell on March 1, 1986, emphasized a blow to the left side of Caldwell's jaw as the principal cause of death. Observing that Caldwell had sustained multiple injuries to the neck and head, Dr. Randall's report stated:

> The most prominent injury is that of a linear abrasion and contusion extending across the left side of the jaw and neck. The external injury patterns are those consistent with having been produced by a rounded blunt instrument. . . . The blow to the left side of the neck would appear to have been the most immedi-ately fatal on the basis of brain stem concussion.

> \* \* \* \* \* \*

> The blow to the top right side of the head shows characteristics consistent with having been inflicted by the blunt end of a tire iron. This blow does not appear to have produced any significant underlying injury to the brain, although again, the degree of brain injury often cannot be accurately ascertained when the individual dies shortly after the blow is sustained.

> \* \* \* \* \* \*

> The cause of death, therefore, in this case is head trauma consistent with that inflicted by a heavy rounded blunt instrument striking the decedent. The most severe and probably the most immediately lethal injury was that sustained on the left side of the jaw and neck. The manner of death is consistent with homicide.

(Autopsy Report at 1–2.)

During his testimony before a grand jury, Dr. Randall elaborated on his conclusions about the blows to the left and right sides of Caldwell's head:

> Q: Are you able to tell with a reasonable degree of medical certainty as to which of these major blows you've identified, or injuries to the skull and neck are, may have been the cause of this autonomic injury [the brain stem concussion]?

> A: Yes.

> Q: Which one?

> A: The injury to the left side of the jaw was much more severe.

> Q: All right. With regard to—it's more severe; are you ruling out the injury to the right side of the head as a possible cause?

A: I can't exclude it as a possible cause, but I do feel it's very unlikely that that injury, in and of itself, would have been lethal.

(Grand Jury Transcript at 7). One grand juror asked, "So, when he got hit on the side of the face, that was the one that most certainly killed him, or-." Dr. Randall responded, "That's correct." (*Id.* at 11.) Dr. Randall also said that after the blow on the left, the victim probably would not have been able to stand up, but that "he would have been able to probably do most anything" after sustaining the blow on the right. (*Id.* at 12.)

Discussing the types of instruments that caused the injuries, Randall testified that the injury on the left side was caused by a single blow with a rounded object such as a baseball bat, a riot baton or a car jack and the injury on the right was caused by an instrument like a tire iron because of the hexagonal characteristic of the bruise. The grand jury returned an indictment against Weddell, Honomichl, and Weston for second-degree murder and first-degree manslaughter.

Prior to trial, Weddell made a motion to sever his case from the cases against Honomichl and Weston. Weddell argued that a severance was necessary because the defendants' defenses were irreconcilable. The trial court denied his motion. It also announced during the trial, before Dr. Randall testified, that the jury instruction on aiding and abetting as requested by the prosecuting attorney would not be given.

During jury selection, the prosecutor, Gary Conklin, used a peremptory challenge against Ella Huapapi, a Native American. None of the defendants objected to the peremptory challenge during the trial.[1] At a habeas hearing several years later, the prosecutor asserted that he struck Huapapi because he had placed a question mark beside her name for the reason that he was not sure she would be a fair and impartial juror and because he had "a gut feeling" that he did not want her on the panel. *See Honomichl v. Leapley,* 498 N.W.2d 636 (S.D.1993).[2]

At trial, eyewitnesses gave conflicting accounts of Caldwell's fatal beating. Some witnesses said that they saw Weddell with a tire iron, a crow bar, or some similar object, although others described him as carrying a wooden club. Some witnesses said Honomichl was carrying a car jack, others a wooden club, and still others a red funnel. The witnesses variously described both Weddell and Honomichl as striking Caldwell in the body or the head. In his trial testimony, Honomichl claimed that he only had a red plastic funnel and that Weddell hit Caldwell on the jaw with a wooden club. Weddell testified that he never struck Caldwell in the head, but only hit him on the upper body with a wooden club. Weddell also testified that he saw Honomichl and Weston beating Caldwell and that he saw Honomichl with a jack.

Dr. Randall testified at trial that the blow to the left side of Caldwell's head was likely caused by a car jack and the blow to the right side of his head by a tire iron. On direct examination, Dr. Randall testified that "the damage to the brain sustained by [Caldwell] is a result of multiple

---

**1.** The United States Supreme Court decided *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) on the second day of trial, after the prosecutor's exercise of the peremptory challenge against Huapapi.

**2.** Weddell's co-defendant, Michael Honomichl, raised the peremptory challenge issue before the South Dakota Supreme Court several years before Weddell filed his own habeas action. *See Honomichl v. Leapley,* 498 N.W.2d at 638–42. In ruling on Weddell's claim, the South Dakota Supreme Court relied on its prior decision in *Honomichl. See Weddell,* 604 N.W.2d at 283.

blows to the head." (Trial Transcript at 490.) On cross-examination, Dr. Randall was pressed to exclude the blow to the right side as a cause of death, but he refused to do so. (*Id.* at 498, 502–03.) At one point, he stated that "I cannot determine what contributory effect the blow to the right side of the head may have had." (*Id.* at 498.) At another point, he said that "it may not be medically accurate to separate out the effects of one versus the other. Certainly the effect of [sic] the left side of the jaw was more severe, but the blow to the right side of the head may well have contributed in some degree to the ultimate death of the decedent." (*Id.* at 498.) On re-cross-examination by Weddell's counsel, Randall conceded that the damage to the brain stem area was "most likely" caused by the blow to the left side of the jaw. (*Id.* at 511.) Randall further admitted it was unlikely that the injury to the right side of Caldwell's head was lethal "[i]n and of itself." (*Id.* at 511.)

At the conclusion of Dr. Randall's testimony, Weddell and Honomichl both moved for a mistrial, based upon their perception of the change in the Dr. Randall's opinion. The trial judge, Judge Hertz, denied their motion. Neither defendant moved for a continuance. At closing argument, the prosecutor told the jury that Caldwell died from multiple blows to the head, and that both Honomichl and Weddell contributed to his death. The jury returned a verdict of guilty as to both defendants on the charges of first-degree manslaughter.

In a direct appeal to the South Dakota Supreme Court, Weddell argued that the trial judge erred in denying his motion for severance, and that there was insufficient evidence to sustain his conviction. The supreme court rejected Weddell's arguments and affirmed his conviction on July 29, 1987. *See Weddell,* 410 N.W.2d at 557.

Almost eight years later, on June 29, 1995, Weddell sought a writ of habeas corpus in state court. In his petition, Weddell raised five claims: (1) that the changes in Dr. Randall's trial testimony violated his right to due process; (2) that the trial court should have granted a mistrial based on Dr. Randall's change in testimony; (3) that his attorney rendered ineffective assistance of counsel; (4) that the State improperly exercised a peremptory challenge against Ella Huapapi; and (5) that his trial should have been severed from Honomichl's.

In the state habeas hearing, Weddell introduced the depositions of two forensic pathologists, Dr. William Eckert and Dr. Vincent Di Maio. Both of these experts testified that the blow to the right did not cause the death of Randy Caldwell. Weddell also took the deposition of his trial attorney, Lee Tappe. Tappe testified that there were two important changes in Dr. Randall's opinion at trial—his conclusion that the blow on the left was caused by a car jack rather than a rounded blunt instrument and his conclusion that the blow on the right contributed to Caldwell's death. After a hearing, the circuit court denied the petition. On January 12, 2000, the South Dakota Supreme Court affirmed. *See Weddell,* 604 N.W.2d at 283.

Weddell filed this federal habeas petition on May 5, 2000, raising the same five grounds that he raised in his state habeas petition. The State of South Dakota resists the petition on its merits. Briefing of the petition was delayed, by agreement of the parties, so that amicus curiae briefs could be filed in support of Weddell. Amicus briefs were filed by Sergio Spolidoro, an attorney from Italy, and by the Bar Human Rights Committee of England and Wales ("the Committee"). The Court held a hearing on the petition on September 17, 2001, with all parties present and represented by counsel. The Committee's amicus brief was filed out of time, but the

Court granted it permission to file its brief and allowed the State to file a response after the hearing.

## DISCUSSION

A state prisoner can obtain federal habeas relief only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Supreme Court explained the standard for granting habeas relief to a state prisoner under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> [Section] 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. ·362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. 1495. "The state court's application must also be unreasonable." *Simmons v. Bowersox*, 235 F.3d 1124, 1130 (8th Cir.2001) (citing *Williams*, 529 U.S. at 411, 120 S.Ct. 1495). "Whether a state court's application was unreasonable is an objective inquiry." *Simmons*, 235 F.3d at 1130 (citing *Williams*, 529 U.S. at 411, 120 S.Ct. 1495). In addition to relief under 28 U.S.C. § 2254(d)(1), a state prisoner's application for writ of habeas corpus may be granted if the state court's adjudication of the prisoner's claim on the merits "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In a § 2254 proceeding, the federal courts must presume the State court's determination of a factual issue is correct. *See* 28 U.S.C. § 2254(e)(1). To rebut the presumption of correctness, the § 2254 petitioner must do so by clear and convincing evidence. *See id.*

### A. Brady Claim

■ "To prove a *Brady* violation, a defendant must show that the prosecution suppressed the evidence, the evidence was favorable to the accused, and the evidence was material to the issue of guilt or punishment." *United States v. Duke*, 50 F.3d 571, 577 (8th Cir.1995). The admission of Dr. Randall's testimony did not violate the constitutional safeguard announced in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under the *Brady* rule, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence *favorable* to the accused that, if suppressed, would deprive the defendant of a fair trial." *Unit-*

ed States v. Bagley, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (footnote omitted and emphasis added). The asserted change in the opinion of Dr. Randall—basically an increased emphasis on the possibility that multiple blows acted in concert to cause Caldwell's death—was *unfavorable* to Weddell.[3] Because the evidence allegedly withheld was inculpatory rather than exculpatory, *Brady* did not require its disclosure. *See United States v. Gowen*, 32 F.3d 1466, 1470 n. 3 (10th Cir.1994).

The government does not have a general constitutional obligation to disclose inculpatory evidence to the defendant prior to trial. In *United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), the Supreme Court rejected a claim that the Air Force had unconstitutionally withheld tapes of an interview with the key witness in a serviceman's sodomy trial.[4] "[A]part from trials conducted in violation of express constitutional mandates," wrote the Court, "a constitutionally unfair trial takes place only where the barriers and safeguards are so relaxed and forgotten .. that the proceeding is more a spectacle or trial by ordeal than a disciplined contest." *Augenblick*, 393 U.S. at 356, 89 S.Ct. 528 (internal citations omitted).

The asserted changes in Dr. Randall's expert opinion prior to trial appear to have been matters of emphasis rather than substance. Contrary to Weddell's suggestion, Dr. Randall's pre-trial opinion did not rule out the possibility of the right-side blow as the cause of Caldwell's death. In his autopsy report, Dr. Randall concluded that the cause of death was "multiple trauma," even though he reported that the "blow to the left side of the neck would appear to have been the most immediately fatal." (Autopsy report at 1–2.) Similarly, before

the grand jury, Dr. Randall refused to exclude the blow to the right as a possible contributing cause, although he stated that it would not have been lethal by itself. Dr. Randall's trial testimony gave greater weight to the possibility that the blow on the right was part of the cause of death. Nevertheless, in testifying that the blows "acted in concert," Dr. Randall went no farther than to say that "the blow to the right side of the head may well have contributed to some degree" to Caldwell's death. (Trial Transcript at 498.) The South Dakota Supreme Court held that Dr. Randall's final opinion, expressed at trial, was not a substantial change from Dr. Randall's initial opinion, as that opinion was expressed in the autopsy report and his grand jury testimony. *See Weddell*, 604 N.W.2d at 279–81.

The asserted changes in Dr. Randall's testimony did not turn Weddell's trial into a "mere spectacle" or "trial by ordeal." *See Augenblick*, 393 U.S. at 356, 89 S.Ct. 528. Dr. Randall's earlier opinions did not rule-out multiple blows acting in concert as a possible cause of death. The change in emphasis—which gave greater weight to the possibility that multiple blows caused Caldwell's death—was not a drastic change from Dr. Randall's earlier opinions. Although Weddell's trial attorney had never interpreted Dr. Randall's pre-trial opinions to allow for a multiple-blow theory, he was able to cross-examine Dr. Randall at trial about the changes in his opinions in an orderly way, by challenging Dr. Randall to explain the asserted difference between his trial testimony and his earlier opinions. This was not the ideal way to test the State's case against Weddell, but it did not cause the trial to degenerate into the kind

---

3. In his opening brief, Weddell concedes that "[Dr.] Randall's changed testimony only helped the State." (Br. at 34.)

4. The serviceman was ultimately convicted of a lesser included offense, committing an indecent act. *Augenblick*, 393 U.S. at 348, 89 S.Ct. 528.

of spectacle that falls below what due process guarantees.

### B. *Failure to Grant a Mistrial*

For similar reasons, the trial court's refusal to declare a mistrial after Dr. Randall testified did not violate Weddell's federal constitutional rights. To prevail on this claim, Weddell must show that the failure to declare a mistrial denied him "the fundamental fairness that is the essence of due process." *Adams v. Leapley,* 31 F.3d 713, 715 (8th Cir.1994). As discussed above, Dr. Randall's testimony did not render the trial fundamentally unfair. Weddell's lawyer had an opportunity to cross-examine Dr. Randall, and did so during the trial. The denial of a mistrial was not fundamentally unfair.

### C. *Assistance of Counsel*

The Supreme Court set forth the standard by which claims for ineffective assistance of counsel are to be evaluated:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The deficiency prong is met when the defendant shows that counsel's representation fell below the " 'range of competence demanded of attorneys in criminal cases.' " *Id.* at 688, 104 S.Ct. 2052 (quoting *McMann v. Richardson,* 397 U.S. 759, 770–71, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). The prejudice prong is met when the defendant shows that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The Court "must indulge a strong presumption that [trial] counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)); *see Parker v. Bowersox,* 188 F.3d 923, 928 (8th Cir. 1999) (same).

Weddell claims that his trial lawyer was ineffective in three ways: (1) in failing to object to or move to strike the testimony of Dr. Randall, (2) in failing to move for a continuance so that an independent pathologist could be retained; and (3) in failing to retain an expert prior to trial to testify about the cause of death.

The first issue to be addressed concerns the South Dakota Supreme Court's decision that Dr. Randall did not substantially change his testimony at trial from his pretrial opinion regarding the cause of death. Whether Dr. Randall changed his testimony is a factual issue that must be presumed to be correct. *See* 28 U.S.C. § 2254(e)(1) (stating that "a determination of a factual issue made by a State court shall be presumed to be correct."). Weddell carries the burden of rebutting the presumption of correctness by clear and convincing evidence. *Id.*

■ There is evidence in the record that would support a finding that Dr. Randall changed his testimony at trial, but there is also evidence that supports the South Dakota Supreme Court's holding. A reasonable attorney reading Dr. Randall's autopsy report and grand jury testimony could

conclude that Dr. Randall's pre-trial opinion was that the blow to Caldwell's left jaw and neck was the cause of death. The autopsy report states that the "most prominent injury" is to the left side of the jaw and neck and that this injury "would appear to have been the most immediately fatal on the basis of brain stem concussion." (Autopsy Report at 1.) In conclusion, the autopsy report states "[t]he cause of death, therefore, in this case is head trauma consistent with that inflicted by a heavy rounded blunt instrument striking the decedent. The most severe and probably most immediately lethal injury was that sustained on the left side of the jaw and neck." (Autopsy Report at 2.) In describing the effect of the blow to the right side of the head, Dr. Randall opined that "[t]his blow does not appear to have produced any significant underlying injury to the brain, although again, the degree of brain injury often cannot be accurately ascertained when the individual dies shortly after the blow is sustained." (Autopsy Report at 1.) During his grand jury testimony, Dr. Randall did not exclude the right side blow as a cause of death, but a fair reading of the testimony is that the blow to the left side of the jaw was the more severe and most immediately fatal of the two blows. (Grand Jury Transcript at 7.)

The evidence supporting the South Dakota Supreme Court's finding includes the "final anatomic diagnosis" in the autopsy report, which states the cause of death was "multiple trauma, head and neck, with fractured left mandible and acute brain stem contusional change." (Autopsy Report at 1.) While Dr. Randall testified to the grand jury that the blow to Caldwell's left side was the more severe, he never excluded the blow to Caldwell's right side as at least a possible contributing cause of death. There is evidence to support Weddell's argument. He has not, however, met his burden to rebut by clear and convincing evidence the presumption that the South Dakota Supreme Court's finding is correct, that Dr. Randall did not substantially change his opinion. Thus, in view of the factual findings of the South Dakota Supreme Court, the ineffective assistance of counsel claims must be analyzed assuming that Dr. Randall did not substantially change his opinion at trial regarding cause of death as stated in the autopsy report and grand jury testimony.

### 1. Failure to Object or Move to Strike

Weddell argues that his lawyer should have moved to strike or objected to Dr. Randall's testimony on two grounds: (a) because of the asserted unfair change in the testimony; and (b) because the testimony was not within a reasonable degree of medical certainty, lacked foundation, or was not expressed in a manner that the jury could have found that the blow on the right caused Caldwell's death.

### a. Changes in the Expert Opinion

Weddell's lawyer was not ineffective for failing to raise the changes in Dr. Randall's testimony as a basis for exclusion. First, the South Dakota Supreme Court found as a factual matter that there was no substantial change in Dr. Randall's trial testimony from his pre-trial opinion. *See Weddell,* 604 N.W.2d at 280. Second, counsel did not make a mistake by failing to object to the testimony or move for it to be stricken. As discussed above, there was no constitutional reason to exclude Dr. Randall's testimony. Likewise, Weddell does not point to any rule of procedure or evidence that prohibited the prosecutor from introducing the testimony into evidence. Third, Weddell cannot establish prejudice in light of his failure to dispute his lawyer's statement that "Judge Hertz as a practical matter would not have grant-

ed the ... motion to strike or kept [Dr.] Randall's testimony out." (Br. at 15, 32.)

### b. *Medical Certainty, Foundation, Manner of Expression*

There has been no showing that Weddell's lawyer was ineffective for failing to object to Dr. Randall's testimony on evidentiary grounds. It is true that the experts retained for Weddell's state habeas hearing disagreed with the conclusions of Dr. Randall. Weddell does not point to any evidence, however, that Dr. Randall's own opinion was scientifically unreliable or lacking in foundation. While Weddell's assertion that the testimony was not "expressed in a manner" that could have supported a conviction may have been grounds for a judgment of acquittal, is not a ground for its exclusion during the trial.

### 2. *Failure to Seek a Continuance*

■ Before trial, Weddell's counsel believed the State was proceeding on the theory that Caldwell was killed by a single blow, and that the defendant who struck the blow was aided and abetted by the other two. During the habeas proceedings in Honomichl's case, the prosecutor testified that he had always perceived this case as a multiple-blow case, but that defense counsel did not accept his view. (Transcript of Honomichl's habeas case at 160.) At trial, the State emphasized a multiple-blow theory in order to convict both Weddell and Honomichl. This perceived change in theory was apparent at least by the point in the trial when Dr. Randall testified and emphasized the portion of his earlier opinions that supported a multiple-blow theory.

There was another, perhaps more important, change in Dr. Randall's testimony as well. As Tappe noted in his deposition, Dr. Randall testified for the first time at trial that the left-side blow was delivered with an instrument that had striations 1/4″ apart, such as a car jack, rather than a rounded blunt instrument. Before that

change, Weddell could not be conclusively ruled out as the defendant who struck the blow on the left, because his testimony was that he used a wooden club. Thus, an expert opinion that the right-side blow did not contribute to Caldwell's death may not have helped Weddell's case. After the testimony, however, it was reasonably clear that Honomichl—the only defendant described as wielding a car jack—hit Caldwell on the left.

At this point, a continuance could have proved a great benefit to Weddell's defense. A continuance might have allowed the defense to retain the services of an expert witness who could contradict the testimony of Dr. Randall on the issue of causation, and take advantage of the evidence that identified Weddell with the blow on the right. Because the blow to the left side of Caldwell's head seemed to have been caused by a car jack and Honomichl was the only defendant described as wielding such a weapon, testimony that Caldwell's death was caused by a single blow to the left side of the head would have certainly aided Weddell's defense.

The Court must evaluate the reasonableness of counsel's performance in light of the circumstances existing at the time and without the benefit of hindsight. *See Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir.2000). According to Tappe's own testimony, there were important changes in Dr. Randall's opinion during the trial. As explained above, a continuance could have been used both to counter and take advantage of the changes in Dr. Randall's testimony. A showing of prejudice is the showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. In light of the opinions of Dr. Eckert and Dr. Di Maio, there is a reasonable probability that a

continuance, properly used, would have led to an acquittal.

While Weddell may be able to show deficient performance for failing to request a continuance, Weddell must also establish the prejudice prong by showing a reasonable probability that a continuance would have been granted. *See United States v. Flores–Ochoa,* 139 F.3d 1022, 1024 (5th Cir.1998) (defendant could not show prejudice absent evidence that court would have granted motion for continuance if it had been made by defendant's counsel); *United States v. Fish,* 34 F.3d 488, 495 (7th Cir.1994) (same). Weddell does not quarrel with his lawyer's testimony, during the state habeas hearing, that Judge Hertz would not have granted a continuance. Nor does he argue that Judge Hertz would have been required to grant a continuance under state law. Thus, Weddell cannot establish prejudice for Tappe's failure to seek a continuance after Dr. Randall testified at trial and habeas relief cannot be granted on this ground.

### 3. *Failure to Retain an Expert*

 There is a presumption that counsel's conduct was a sound trial strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Moreover, the Court must "make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time [of trial]." *Id.* The South Dakota Supreme Court held that trial counsel was not ineffective for failing to retain an expert witness. *Weddell,* 604 N.W.2d at 282–83. The supreme court found that Weddell's defense strategy was to prove that Weddell did not strike Caldwell in the head and that given this defense, expert witness testimony may not have helped him at trial. *See id.*

The State argues that Weddell's counsel reasonably decided not to retain an expert

to testify about whether the blow to the right side of Caldwell's head was the cause of death, because Weddell steadfastly refused to admit that he ever struck Caldwell on the head. This argument is apparently derived from the South Dakota Supreme Court's opinion on the issue of ineffective assistance of counsel for failure to retain an expert. *See Weddell,* 604 N.W.2d at 282–83. The supreme court stated that defense counsel's entire strategy at trial was to prove that Weddell did not strike Caldwell on the head. *See id.* at 282. Conversely, Weddell argued in the state habeas proceedings that " '[t]he whole defense was based on the theory that the blow on the left was the one causing the death of Caldwell. Only one blow caused the death of Caldwell and there were two defendants. An expert, had one been retained, would have been available to testify if the need arose, as it did.' " *Id.* (quoting Weddell's brief to the South Dakota Supreme Court in state habeas proceedings.)

The supreme court rejected Weddell's argument regarding the theory of defense and held that Weddell's only theory of defense was that he did not strike Caldwell on the head. *See id.* Given Weddell's theory as determined by the supreme court (that Weddell did not strike Caldwell on the head), the court held that having an expert to exclude the right side blow as a cause of death may not have been beneficial to Weddell. The supreme court went on to note that "[h]owever, it may have been better practice to argue alternatively that, if the jury found his blows *were* to the head, then, in that event, Weddell still could not be convicted of first degree manslaughter, unless the jury also found the blow or blows to the head contributed to Caldwell's death." *Id.* Thus, the supreme court did not believe that Weddell's trial counsel made the argument that even if the jury found Weddell struck Caldwell on

the head he did not strike the fatal blow. *See id.* This conclusion is wholly contradicted by Weddell's trial counsel's closing argument, wherein trial counsel specifically argued: "Certainly the testimony is clear that if Jimmy [Weddell] did hit anybody and if it was with a metal instrument of some sort . . . that that was not the cause of death." (Trial Transcript at 978.)[5] This was the alternative argument that the South Dakota Supreme Court suggested it may have been "better practice" to argue to the jury. *See Weddell,* 604 N.W.2d at 282. While Weddell's trial counsel did not explicitly argue that Weddell struck the right side blow to Caldwell's head, he did argue that Weddell did not strike the left side blow to Caldwell's head, which he argued was the fatal and sole cause of death.

This is one of the rare situations in which the adjudication of Weddell's ineffective assistance of counsel claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The South Dakota Supreme Court's factual determination that Weddell's only defense at trial was that he did not strike Caldwell in the head is unreasonable in light of the trial transcript. (See Trial Transcript at 492–502, 511, 953–982.) Weddell has rebutted, by clear and convincing evidence, the presumption of correctness afforded the State court's factual determination. *See* 28 U.S.C. § 2254(e)(1). Thus, the issue now before the Court is whether Weddell has shown that his trial counsel rendered ineffective assistance of counsel by failing to retain an expert pathologist.

The starting point for this inquiry is the South Dakota Supreme Court's factual finding that prior to trial Dr. Randall did not exclude the right side blow as a proximate cause of Caldwell's death, such that defense counsel should have known that the State was proceeding on a multiple-blow theory as the cause of death. Dr. Randall placed more emphasis on the right side blow as a contributing factor during trial, but the South Dakota Supreme Court did not find his testimony at trial to be substantially different than his pre-trial opinions in his grand jury testimony and autopsy report. *See Weddell,* 604 N.W.2d

---

5. The theory that Weddell did not strike the fatal blow was mentioned throughout Weddell's trial counsel's closing argument:

> "So I don't think there is any serious doubt that the lethal blow was the blow that struck at the base of the head and spinal cord and caused the motor functions to stop, the breathing, the respiration. . . . And quite frankly, I have no idea how anybody can avoid that conclusion, that the jack killed Randy, and that the defendant Weddell did not have the jack. And I don't think the evidence shows it. But I think it would be safe to say even if the evidence showed that Jimmy Weddell hit that guy 40 times throughout the body—the evidence doesn't show that—but if it did, you wouldn't have a proximate cause of death that is necessary in this case to find him guilty of murder, manslaughter."

(Trial Transcript at 962–63.)

> "Ladies and gentlemen, I submit that we can completely disregard Jimmy's testimony. I'm not asking anyone to do that, I would prefer that you didn't. But he could have stayed in the hallway during this trial and the State didn't prove its case. The wooden club was in Jim's hand by everybody else; that he was away from the scene. Some witnesses had him standing right there and some had him swinging and missing, but none had a jack in his hand or any weapon that caused that lethal blow."

(Trial Transcript at 964.)

Lee Tappe, Weddell's trial counsel, further testified in a deposition in the state habeas proceedings that although they wanted to establish that Weddell did not strike Caldwell in the head, that they also wanted to establish in the alternative that even if Weddell struck Caldwell in the head it was not on the left side, which to Tappe's understanding was the fatal blow. (Tappe Depo. at 9, 11–13.)

at 280. Based on the South Dakota Supreme Court's factual finding that the multiple-blow theory was apparent from Dr. Randall's pre-trial opinions, Weddell's trial counsel rendered ineffective assistance in failing to appreciate the possibility that the State would rely on a multiple-blow theory. Moreover, the prosecutor testified that he conveyed the multiple-blow theory to defense counsel but that they would not accept it and they believed it was a single blow that killed Caldwell. (Transcript of Honomichl habeas hearing at 160.)

Failing to appreciate the possibility, if not the probability, of a multiple-blow theory placed Weddell in the position of going to trial without an expert to rebut Dr. Randall's opinion that the right side blow contributed to Caldwell's death. Thus, the jury could find Weddell guilty if he struck either or both of the right or left side blows to Caldwell's head. Given at least the possibility of a multiple-blow theory, a defense expert, such as Dr. Eckert or Dr. Di Maio, was necessary to rebut the State's argument that this was a multiple-blow case. Tappe admitted this in his deposition when he testified in the state habeas proceedings, "[l]ooking back, if I would have known ahead of time that [Dr. Randall] was going to contend that both blows contributed to the death, I think I would have asked for an expert on my own to refute that." (Tappe Depo. at 27.)

In addition to rebutting the multiple-blow theory, at the commencement of the trial, Weddell's trial counsel did not know for certain whether the wooden club he believed Weddell possessed could have inflicted the left side blow as explained in the autopsy report. Before the trial, the autopsy report indicated the left side blow was inflicted with a "rounded blunt instrument." (Autopsy Report at 1.) Tappe admitted this weakness during his deposition when he said "But I was concerned that [Dr. Randall] had said that the instrument

was a rounded, smooth instrument. Well, my client's club would be a rounded, smooth instrument also." (Tappe Depo. at 15.)

During trial, Dr. Randall narrowed his pre-trial opinion regarding the instrument that inflicted the left side blow to Caldwell's neck and jaw from a "rounded blunt instrument" to an instrument such as a car jack with striations 1/4 inch apart. Weddell's defense gained an unexpected advantage, because the trial testimony preceding Dr. Randall's was that Honomichl, not Weddell, wielded a car jack during the fight. Presumably if Dr. Randall was able to make this conclusion from examining photographs, another pathologist retained by the defense could have reached the same conclusion and informed Weddell's trial counsel of this conclusion prior to trial, which would have made it even more important for Weddell to establish that the left side blow was the sole cause of death. While Weddell "lucked out" that the State's pathologist essentially excluded his weapon as the one that inflicted the left side blow, trial counsel did not have that information prior to trial and it does not excuse counsel from failing to seek an expert to identify the instruments inflicting the blows. Moreover, after the development at trial that a weapon such as a car jack, rather than a wooden club, inflicted the left side blow, it became crucial to Weddell's defense to have an expert to testify the left side blow was the sole cause of death. For all of the above reasons, the Court concludes that Tappe's representation of Weddell was deficient for failing to retain an expert to testify regarding the cause of Caldwell's death.

The prejudice prong of the ineffective assistance of counsel claim was addressed above in connection with Weddell's claim that Tappe should have sought a continuance. During the state habeas proceed-

ings, Weddell presented the testimony of two forensic pathologists that conclusively testified that the right side blow did not contribute in any way to Caldwell's death. Although having an expert to rebut the state's expert may not always result in the defendant prevailing at trial, this case is exceptional because Dr. Randall's opinion that the right side injury contributed to Caldwell's death was weak at best. When asked directly about the contributory effect of the right side blow, Dr. Randall stated that the right side blow "may well have contributed to some degree to the ultimate death of the decedent." (Trial Transcript at 498.) Dr. Randall further stated "[m]y testimony though is that I cannot determine what contributory effect the blow to the right side of the head may have had." (*Id.* at 498.) In contrast to Dr. Randall's testimony, Dr. Eckert and Dr. Di Maio testified that the right side blow did not contribute at all to Caldwell's death. Based upon the present record, the Court's confidence in the outcome of the trial has been undermined by Weddell's attorney's failure to retain an expert to testify about the causation of Caldwell's death. Thus, there is a reasonable probability that, but for counsel's unprofessional error in not retaining an expert, the result of Weddell's trial would have been different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

Weddell has established that trial counsel's performance was deficient and that he was prejudiced by that deficient performance. Thus, Weddell is entitled to habeas relief on his claim that he received ineffec-

tive assistance of counsel for failure to retain an expert.

### D. *Batson Claim*

As the Supreme Court observed in *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race."[6] A *Batson* challenge involves a three-step, burden shifting analysis. First, the defendant must establish a prima facie case of purposeful discrimination. *Batson,* 476 U.S. at 96, 106 S.Ct. 1712. If a prima facie case is established, in the second step the burden shifts to the State to come forward with a neutral explanation for challenging the juror. *Id.* at 97, 106 S.Ct. 1712. It is clear under Supreme Court precedent that during this second step, even a "silly or superstitious" reason may be sufficient because "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). " 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Id.* at 768, 115 S.Ct. 1769 (quoting *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion)). If a race-neutral reason is not given, the conviction must be reversed. *Batson,* 476 U.S. at 100, 106 S.Ct. 1712. If a race-neutral reason is given, however,

---

6. *Batson* was decided on the second day of trial, after Ella Huapapi had been stricken from the panel of potential jurors. *Batson* applies to all cases not yet final when it was decided. *See Randolph v. Delo,* 952 F.2d 243, 245 n. 2 (8th Cir.1991).

 Although Weddell did not object to the peremptory challenge when it was exercised, his

failure to do so has not impeded the development of a record of the prosecutor's asserted reasons for exercising the challenge. *Compare Carter v. Hopkins,* 151 F.3d 872, 875 (8th Cir.1998). In addition, the State has waived the issue of procedural default by failing to raise it before now. *Id.* at 875 n. 8.

then the court must go to the third step to determine whether the opponent of the challenge has proven purposeful discrimination. *Id.,* at 98, 106 S.Ct. 1712. "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769.

The State habeas court determined that Weddell made out a prima facie case of purposeful discrimination. *See Weddell,* 604 N.W.2d at 283 (adopting decision on *Batson* issue from *Honomichl,* 498 N.W.2d at 638–39, in which the State habeas court found that Honomichl established a prima facie case and the State did not challenge that finding on appeal). The Eighth Circuit explained that a State trial court's and State habeas court's resolution of a *Batson* issue is a factual determination subject to the statutory presumption of correctness set forth in 28 U.S.C. § 2254(e)(1), which a habeas petitioner must rebut by clear and convincing evidence to prevail. *See Weaver v. Bowersox,* 241 F.3d 1024, 1030–32 (8th Cir.2001). Thus, the finding that Weddell established a prima facie case is a factual determination subject to the presumption of correctness set forth in 28 U.S.C. § 2254(e)(1). A defendant can establish a prima facie case under *Batson* by showing (1) that he is a member of a cognizable racial group, (2) that the challenged juror is a member of the same racial group, and (3) that the relevant circumstances of voir dire support an inference of discriminatory purpose. *See United States v. Moreno,* 217 F.3d 592, 594 (8th Cir.2000) (citing *Batson,* 476 U.S. at 96, 106 S.Ct. 1712). In this case, Weddell and Honomichl were both Native Americans, as was Ella Huapapi, the juror at issue.

The case involved the alleged attack by Weddell and Honomichl on a white man in Charles Mix County, South Dakota. Ultimately, there were no Native Americans on the jury. The prosecutor, Gary Conklin, exercised two of his peremptory challenges to strike Huapapi and Ben Cadotte, the two prospective Native American jurors that were not excused for cause. Two Native American jurors were stricken for cause. Weddell challenges the strike of Huapapi, and emphasizes that no Native Americans were allowed on the jury. The State habeas court found these facts were sufficient to establish a prima facie case of discrimination. *See Weddell,* 604 N.W.2d at 283 (incorporating result from *Honomichl,* 498 N.W.2d at 637–42 on this issue). During oral argument on the Petition in this case, counsel for the government essentially conceded that a prima facie case had been established and that the South Dakota Supreme Court's conclusion in *Honomichl* is applicable in Weddell's case.[7] Thus, the issue at the second step of the *Batson* analysis is whether the State came forward with a race-neutral reason for striking Huapapi.

In Weddell's case, the South Dakota Supreme Court incorporated the rationale and holding in *Honomichl,* 498 N.W.2d at 639–42, in rejecting Weddell's *Batson* challenge for the prosecutor's strike of Huapapi from the jury panel. *See Weddell,* 604 N.W.2d at 283. In *Honomichl,* the supreme court held that the prosecutor did articulate a reason for exercising a peremptory challenge on Huapapi:

During the habeas proceeding, Conklin [the prosecutor] testified that prior to trial he researched the background of each prospective juror. He met with

**7.** During oral argument on the present § 2254 Petition, counsel for the State of South Dakota, Craig Eichstadt, stated "[w]ith regard to the Batson issue number four with Ms. Huapapi, it is undisputed that she was a Native American, and that she was preempted. Perhaps that's a prima facie case as shown under Batson, at least the Courts assumed that it was, so I suspect that we need to go with their conclusions."

the sheriff and his deputies. As a result, he entered research notes and question marks alongside several names on the jury list. Conklin testified that he put a question mark by Ella Huapapi's name because he was not sure she would be a fair and impartial juror; that he had a "gut feeling" about her.

During the habeas proceeding, it was revealed that John Huapapi, a relative of Ella Huapapi, had recently been prosecuted by Conklin in his capacity as the Charles Mix County State's Attorney. Conklin testified that at the time he exercised his peremptory on Ella Huapapi, he did not think he realized this fact; rather, it was the question mark beside her name which caused him to strike her.

498 N.W.2d at 640–41. The supreme court concluded that the prosecutor's exercise of the peremptory challenge on Huapapi was not solely on account of her race and that the neutral explanation was not pretextual. *Id.* at 641–42.

■ For the reasons set forth below, the Court concludes that Weddell has rebutted the presumption of correctness afforded the South Dakota Supreme Court's factual determination that the prosecutor gave a race-neutral explanation for striking Huapapi and further concludes that the State habeas proceedings resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. *See* 28 U.S.C. § 2254(d)(2) and (e)(1). Relief under 28 U.S.C. § 2254 will accordingly be granted on the *Batson* issue.

■ To meet the requirements of *Batson*, a prosecutor's race neutral explana-tion must be a "clear and reasonably specific explanation of his legitimate reasons" for exercising the challenge. *Batson,* 476 U.S. at 98 n. 20, 106 S.Ct. 1712. The reason must be more than "denying that he had a discriminatory motive or affirming his good faith." *Id.* at 98, 106 S.Ct. 1712. As recognized in *Purkett,* however, the Court's inquiry is limited to determining whether the offered explanation is facially valid. 514 U.S. at 767–68, 115 S.Ct. 1769.

The State habeas court found that " 'there was apparently a spark in [the prosecutor's] memory that was struck upon encountering the Huapapi name and this was sufficient to cause him to question the impartiality of Ms. Huapapi.' " *Honomichl,* 498 N.W.2d at 641 (quoting State habeas court). The State habeas court further concluded that " '[t]he fact that the name "Huapapi" raised enough of a concern to cause Mr. Conklin to place a question mark ("?") beside the name after he did some investigation *has no relation at all* to the fact that Ms. Huapapi is a Native American. The name that caused concern to Mr. Conklin could just as easily have belonged to a[C]aucasian or any other ethnic group as it did to a Native American.' " *Id.* (emphasis added). The inference drawn by the State habeas court and the South Dakota Supreme Court on habeas review from Conklin's testimony was that the "spark" in Conklin's memory was that he had recently prosecuted one of Huapapi's relatives. Conklin's testimony, however, provides clear and convincing evidence that he did not have a "spark" in his memory about John Huapapi. Conklin admitted that he did not place the question mark beside Huapapi's name because he recently prosecuted John Huapapi.[8] Dur-

---

**8.** Due to its importance, the Court will quote the relevant portion of Conklin's testimony. On direct examination by Attorney Timothy Whalen, State's Attorney, Gary Conklin testified as follows:

Q. Why did you exercise your pre-emptory challenge, your second pre-emptory challenge, on Ella Huapapi?

A. I had a list of jurors I was given by the clerk of courts before the trial began and,

ing the State's direct examination of Conklin at the habeas hearing where they were discussing the question mark and the prosecution of John Huapapi, Conklin testified

as was my practice with all jury trials, I went over the list with the sheriff's office. [S]ome of these people I had dealt with during the course of my duties as state's attorney and I made notes on that list as to various persons on the list. And I recall as to her I had a question mark beside her name. I guess because of the nature of this type of case I decided I didn't want to have a juror on the panel with a question mark that I wasn't sure of. So I struck her name off.

Q. Do you recall prosecuting a John Huapapi?

A. Yes. D.W.I., I think.

Q. And do you know whether or not John was related to Ella?

A. I understand that he is.

Q. Had you known that at that time? Do you remember?

A. No, I don't think I did at the time. I didn't make the connection right away.

(Transcript of Honomichl's habeas case at 151–55).

On cross examination by Honomichl's habeas counsel, Mr. John Schlimgen, Gary Conklin testified as follows:

Q. Now, Ella Huapapi. Your testimony on direct examination was that it's your usual process to go over the jury list and make notes on it essentially; is that essentially what you testified to?

A. Yes.

Q. And you had on here by her name a question mark?

A. That's right.

Q. You further indicated that her cousin had been convicted of a crime that you prosecuted?

A. I believe it was a D.W.I. offense at the time when he was either living or traveling back and forth between here and Minneapolis, if I remember right.

Q. It was your further testimony was that you didn't realize that at the time of the jury selection; right?

A. True.

Q. So that didn't enter into your reason for taking her off the panel, then?

A. No. But the question mark did.

Q. Okay. What did the question mark reflect?

A. Well, I guess one of the luxuries that we don't have in Sioux Falls that you have in the rural counties is that you can go to the sheriff's office and you can ask the sheriff or his deputies about his potential jurors. This county is small enough so that virtually everybody is known to law enforcement, either good or bad. And we all go through life and develop our reputation for being good, bad or whatever. And what I attempted to do is to basically go through the jury panel list with the sheriff's office and to select from them people that I thought would be good jurors for the state. And I did that. And when I came to Mrs. Huapapi's name I wasn't sure what kind of juror she would be so I put a question mark. And I guess because of the stakes involved in this case I felt, if I wasn't sure I would have a fair juror that I would not include her or let her stay on as a potential juror.

Q. And you only had what, six question marks on that list. That's all you struck

A. Well, each defense attorney had ten pre-emptory challenges. I felt pretty comfortable with the jury panel as we got toward the end. I mean, you could sit there as an attorney, I think after awhile I almost felt about as comfortable with the first twelve jurors we picked as the last twelve we ended up with. But they chewed up a bunch of jurors so I had to chew up a few, too. And I didn't use all my pre-emptory challenges, and quite frankly I don't always use up my pre-emptory challenges.

Q. That wasn't my question.

A. Okay.

Q. My question was that you only had six question marks, I think that's how many pre-empts you used?

A. I don't think the pre-emptory challenges all had question marks by them. Some of them I had written notes, some I had question marks.

Q. So the only thing you can tell us at this time about—you can't tell us anything definite as to why you took Mrs. Huapapi off the stand?

A. No. Other than a gut feeling I didn't think I wanted her on the jury panel.

Q. And that's it?

A. Well, been four and a half years, I'm sorry I can't remember more than that.

(Transcript of Honomichl's habeas case at 164–66).

that he did not make the connection between Huapapi and the driving while intoxicated prosecution of John Huapapi, her cousin. Conklin's testimony concerning the placement of the question mark beside Huapapi's name was "[a]nd when I came to Mrs. Huapapi's name I wasn't sure what kind of juror she would be so I put a question mark. And I guess because of the stakes involved in this case I felt, if I wasn't sure I would have a fair juror that I would not include her or let her stay on as a potential juror." (Transcript of Honomichl's habeas proceedings at 165.) Conklin did not offer any reason for thinking Huapapi would not have been a fair juror. And he never testified that he had any type of "spark" in his memory about why Huapapi would not be a fair juror. When asked if he could explain why he took Huapapi off the jury, Conklin stated "No. Other than a gut feeling I didn't think I wanted her on the jury panel." (*Id.* at 166.)

The Court finds incredible the State habeas court's finding that the Huapapi name could be a Caucasian name just as easily as it could have been a Native American name. No one testified that Huapapi was or could be a Caucasian name. The prosecutor himself did not testify that he was unaware that "Huapapi" was a Native American name. Moreover, the prosecutor testified that he spoke about the potential jurors with the sheriff's office and that virtually every person in this small community was known by law enforcement. In any event, there is no evidence in the record for the State habeas court's finding that Huapapi could be a Caucasian name.

It is clear from the decisions of the State habeas court and the South Dakota Supreme Court that those courts concluded Conklin placed the question mark beside Huapapi's name *while* he was at the sheriff's office. This finding is an inference drawn from Conklin's testimony during the habeas proceeding, where Conklin was testifying about his usual practice of going to the sheriff's office. It was never clarified at the hearing, however, when exactly Conklin placed the question mark beside Huapapi's name.

In this case, the prosecutor did not provide an explanation for striking Huapapi that is facially valid. Conklin testified that he usually spoke with the sheriff's office regarding prospective jurors. He did not, however, remember when he struck Huapapi from the jury that he had prosecuted a relative of Huapapi and he did not testify that the reason there was a question mark beside her name was that he has prosecuted a relative of hers. Thus, the reason for the question mark beside Huapapi's name is unexplained. Essentially there is no explanation for the strike of Huapapi because the prosecutor could not explain why he had a question mark beside her name. If a prosecutor could simply place a question mark beside the names of all jurors of the same race as the defendant on the jury list and rely on that question mark as the race-neutral reason, without objectively explaining the reason for its placement, the *Batson* holding would be rendered meaningless.

Although Conklin could have had a race-neutral reason for placing a question mark beside Huapapi's name or having "gut feeling" she would not have been a "fair" juror, his reason could have also been that he did not want Huapapi on the jury because she was Native American. It is impossible for the Court to determine whether a "gut feeling" is related to the juror's race without any additional explanation from the prosecutor for questioning the juror's qualifications. Ultimately, it was the State's burden to produce a race-neutral reason for striking Huapapi. The striking of a Native American juror be-

cause of a question mark beside her name without the prosecutor's explanation for placing the question mark there in the first place, other than he wasn't sure if she would be a "fair" juror or he had a "gut feeling" he didn't want her on the jury, is not a facially valid, race-neutral explanation. It is not even a "silly" or "superstitious" reason. *See Purkett,* 514 U.S. at 767–68, 115 S.Ct. 1769. At its essence, the question mark in this case is no explanation at all.

The supreme court distinguished a case from Honomichl's, and consequently Weddell's, case where the prosecutor's only explanation was that he had a "gut feeling" about a particular individual. *See Honomichl,* 498 N.W.2d at 640, n. 6 (distinguishing *United States v. Horsley,* 864 F.2d 1543 (11th Cir.1989)). After discussing the *Horsley* case, the supreme court concluded by stating "[i]n any event, in the instant case we are not presented with a 'gut feeling' standing alone." *Id.* Contrary to the supreme court's finding, Conklin's asserted reason is that he had a "gut feeling" that Huapapi would not be a fair juror, with no explanation from Conklin of why Huapapi would not be fair.

For the reasons set forth above, the Court finds that Weddell has rebutted, by clear and convincing evidence, the presumption of correctness afforded the South Dakota Supreme Court's factual finding that the State came forward with a race-neutral explanation for challenging Ella Huapapi, which lead to its denial of habeas relief to Weddell on his *Batson* claim. The State's failure to come forward with a race-neutral reason for striking Huapapi from the jury requires a reversal of Weddell's conviction. *See Batson,* 476 U.S. at 100, 106 S.Ct. 1712. The Court further finds the South Dakota Supreme Court's decision denying habeas relief to Weddell on his *Batson* claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Accordingly, the Court will grant Weddell's § 2254 Petition on the *Batson* claim.

### E. *Severance*

Weddell argues that he should have been granted a severance because his defense was irreconcilable with Honomichl's defense. He argues, apparently by reference to the Federal Rules of Criminal Procedure, that the Constitution forbids joint criminal trials when the defenses are mutually antagonistic. The Supreme Court, however, has held that "[m]utually antagonistic defenses are not prejudicial *per se.*" *Zafiro v. United States,* 506 U.S. 534, 538, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). In this case, the defenses were not mutually antagonistic. Depending upon the jury's assessment of Dr. Randall's testimony about whether the right blow contributed to Caldwell's death, the jury could have convicted Honomichl and not Weddell. The Court does not find that the South Dakota Supreme Court's holding on the severance issue was contrary to or an unreasonable application of clearly established Federal law.

### F. *Certificate of Appealability*

A prerequisite to an appeal from the denial of a § 2254 petition is a certificate of appealability under 28 U.S.C. § 2253(c). Such a certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *See* Fed. R.App. P. 22(b); 28 U.S.C. § 2253(c). A "substantial showing" under this section is a showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), or that "a court could resolve the issues different-

ly, or the issues deserve further proceedings," *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir.1997). The Court does not find that Weddell has made a substantial showing of the denial of a constitutional right on any ground on which the Petition was not granted. Thus, a certificate of appealability will not be issued in this case.

## CONCLUSION

Weddell is entitled to federal habeas relief on the claim that he was denied effective assistance of counsel when his attorney failed to retain an expert witness to testify about the proximate cause of Caldwell's death and on his *Batson* claim. Thus, Weddell is entitled to a new trial. A certificate of appealability will not be issued on any of the grounds or claims on which the Petition was not granted. Accordingly,

IT IS ORDERED:

1. That petitioner, James Weddell's, Petition for Writ of Habeas Corpus By Person In State Custody Pursuant to 28 U.S.C. § 2254, Doc. 1, is granted on that aspect of ground three involving petitioner's claim that he was denied effective assistance of counsel when his attorney failed to retain an expert and on ground four involving his *Batson* claim and the Petition is denied in all other respects.

2. That the State of South Dakota shall commence proceedings to afford the petitioner, James Weddell, a new trial within 60 days of the date of this Order or release the petitioner from custody on the conviction and sentence challenged in this action.

3. That a certificate of appealability shall not issue on any of the grounds for relief on which the Petition was not granted.

## JUDGMENT

In accordance with the Memorandum Opinion and Order filed this date with the Clerk,

IT IS ORDERED, ADJUDGED, and DECREED that Petitioner, James Weddell's Petition For Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, is granted on that aspect of ground three in the Petition involving Petitioner's claim that he was denied effective assistance of counsel when his attorney failed to retain an expert and on ground four of the Petition involving Petitioner's *Batson* claim. The Petition is denied in all other respects.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that unless the State of South Dakota commences proceedings to afford Petitioner James Weddell a new trial within sixty days of the date of this Order, Petitioner James Weddell shall be released from custody on the conviction and sentence challenged in this action.